# ALDORT DECLARATION

# EXHIBIT 22, PART 2



Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)**

**C**Melendez v. Greiner
S.D.N.Y.,2003.
Only the Westlaw citation is currently available.
United States District Court,S.D. New York.
Michael MELENDEZ, Plaintiff,
v.
Charles GREINER, Superintendent, Sing Sing
Facility, et al., Defendants.
**No. 01 Civ.07888 SAS DF.**

Oct. 23, 2003.

State inmate, proceeding pro se in his § 1983 action alleging denial of appropriate medical care, moved to compel responses to interrogatories and production of documents. The District Court, Freeman, United States Magistrate Judge, held that: (1) court would consider defendants' objections to inmate's discovery demands, even though objections were untimely; (2) requests for discovery regarding defendants' prior conduct with respect to other inmates, and the appropriate protocol to be followed by prison personnel in the event of an injury to an inmate, would be granted; (3) inmate would be provided with a general description of where the relevant prison rules, regulations, and policies were maintained, and if and how the documents were distributed or made available to corrections officers and others responsible for tending to inmates' medical needs; and (4) responses to inmate's request for information regarding the agencies employing defendants, the periods of such employment, and defendants' salaries, had been adequate.

Motion granted in part and denied in part.

West Headnotes

**[1] Federal Civil Procedure 170A** 🔑**1269.1**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1269 Grounds and Objections
                170Ak1269.1 k. In General. Most Cited Cases
Court would consider defendants' objections to

inmate's discovery demands, in his § 1983 action, even though objections were untimely; defendants might have misconstrued earlier rulings and believed in good faith that they were not required to meet deadline, and inmate would not be prejudiced thereby. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 33(b)(4), 28 U.S.C.A.

**[2] Federal Civil Procedure 170A** 🔑**1581**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1581 k. In General. Most Cited Cases
To extent that documents sought by inmate, in his § 1983 action alleging denial of appropriate medical care, involved conduct similar to that alleged by inmate, requests for discovery regarding defendants' prior conduct with respect to other inmates would be granted, absent any showing of undue burden, privilege, or some other reason why, in the interest of justice, the requested documents should be withheld from disclosure. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

**[3] Federal Civil Procedure 170A** 🔑**1593**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1593 k. Government Records, Papers and Property. Most Cited Cases
To extent that prison rules, regulations, and policies sought by inmate, in his § 1983 action alleging denial of appropriate medical care, were relevant to inmate's specific claims and set forth appropriate protocol to be followed by prison officers and personnel when inmates sustained physical injuries, requests for discovery would be granted. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

**[4] Federal Civil Procedure 170A** 🔑**1581**

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)3 Particular Subject Matters
                170Ak1581 k. In General. Most Cited Cases
Inmate's request, in his § 1983 action alleging denial of appropriate medical care, for discovery of the identity of all persons possessing prison rules, regulations, and policies, was overbroad, and therefore would be granted to extent of a general description of where the relevant rules, regulations, and policies were maintained, and if and how the documents were distributed or made available to corrections officers and others responsible for tending to inmates' medical needs. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

**[5]** Federal Civil Procedure 170A ⚛1634

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1634 k. Sufficiency of Compliance. Most Cited Cases
To extent that inmate's request, in his § 1983 action alleging denial of appropriate medical care, for discovery of all contracts for services of prison medical personnel and providers of physical therapy, had not already been provided, defendants were instructed to supplement their responses to set forth the range of services the medical personnel and physical therapists were obligated to provide to inmates. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

**[6]** Federal Civil Procedure 170A ⚛1634

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1634 k. Sufficiency of Compliance. Most Cited Cases

Defendants' responses to inmate's request, in his § 1983 action alleging denial of appropriate medical care, for information regarding the agencies employing defendants, the periods of defendants' employment, and defendants' salaries, were adequate, and therefore inmate's request for further responses would be denied. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

**[7]** Federal Civil Procedure 170A ⚛1634

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(E) Discovery and Production of Documents and Other Tangible Things
            170AX(E)5 Compliance; Failure to Comply
                170Ak1634 k. Sufficiency of Compliance. Most Cited Cases
To extent that defendants, in inmate's § 1983 action alleging denial of appropriate medical care, possessed any information regarding physical therapy sessions allegedly attended by inmate and refused, defendants were directed to supplement their discovery responses, even though defendants had already provided inmate with his medical records. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

**[8]** Federal Civil Procedure 170A ⚛1274

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1272 Scope
                170Ak1274 k. Evidentiary Matters. Most Cited Cases

**Federal Civil Procedure 170A ⚛1275**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1272 Scope
                170Ak1275 k. Identity and Location of Witnesses and Others. Most Cited Cases
Inmate's request for discovery of defendants' exhibits and witnesses, in his § 1983 action alleging denial of appropriate medical care, was premature, to extent that request sought defendants' final exhibit or

Not Reported in F.Supp.2d                                                                          Page 3
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)**

witness list for trial, and therefore parties were directed to make necessary trial disclosures in accordance with trial judge's individual practices with respect to any required submission of a joint pretrial order. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

**[9] Federal Civil Procedure 170A ⇐1275**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(A) In General
            170Ak1272 Scope
                170Ak1275 k. Identity and Location of Witnesses and Others. Most Cited Cases
Defendants, in inmate's § 1983 action alleging denial of appropriate medical care, were instructed to inform inmate and the court, within one week, as to whether defendants intended to retain any trial experts, where discovery, including expert discovery, was to have been completed some time previously. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

**[10] Federal Civil Procedure 170A ⇐1506**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(D) Written Interrogatories to Parties
            170AX(D)2 Scope
                170Ak1506 k. Adverse Party's Case, Matters Relating to in General. Most Cited Cases

**Federal Civil Procedure 170A ⇐1512**

170A Federal Civil Procedure
    170AX Depositions and Discovery
        170AX(D) Written Interrogatories to Parties
            170AX(D)2 Scope
                170Ak1512 k. Identity and Location of Witnesses and Others. Most Cited Cases
Inmate would be allowed, inasmuch as he was proceeding pro se in his § 1983 action alleging denial of appropriate medical care, to more narrowly tailor his contention interrogatories concerning the identity of witnesses with knowledge of the bases for defendants' denials, and for information as to defendants' reasons for denying certain allegations, pleading insufficient knowledge to respond to other allegations, and raising an affirmative defense, even

though inmate's initial requests were not sufficiently specific and were premature when served. 42 U.S.C.A. § 1983; Fed.Rules Civ.Proc.Rule 26, 28 U.S.C.A.

### MEMORANDUM AND ORDER

FREEMAN, Magistrate J.
**\*1** *Pro se* plaintiff Michael Melendez ("Melendez") moves pursuant to Fed.R.Civ.P. 37(a) to compel defendants to respond to certain interrogatories and to produce certain documents in discovery in this action. Defendants oppose Melendez's motion, principally arguing that the discovery requests in question are overbroad and unduly burdensome, seek privileged information and documents, and exceed the scope of Local Civil Rule 33.3. For the reasons set forth below, Plaintiff's motion is granted in part and denied in part.

### BACKGROUND

In this action brought pursuant to 42 U.S.C. § 1983, Melendez complains that he has been denied appropriate medical care while incarcerated. More specifically, he alleges that defendants have been deliberately indifferent to his need for treatment of an injured hand, and that he has endured pain and suffering as a result of defendants' repeated failure to treat the injury properly. (Complaint filed Aug. 23, 2001 (Dkt.2), ¶¶ 20-75.)

The information and documents Melendez seeks primarily relate to prior inmate complaints, grievances, and/or court actions brought against the defendants, to the individual defendants' employment histories and duties as employees of the Department of Correctional Services ("DOCS"), and to Melendez's medical treatment. He also seeks the identification of trial witnesses and exhibits, and information regarding the bases of certain assertions made by defendants in their Answer to his Complaint.

### DISCUSSION

#### I. APPLICABLE LAW

A. *Rule 26 Standards*

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)

Under Rule 26 of the Federal Rules of Civil Procedure, parties may obtain discovery "regarding any matter, not privileged, that is relevant to the claim or defense of any party.... Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence."Fed.R.Civ.P. 26(b)(1). Although not unlimited, relevance for the purposes of discovery is "an extremely broad concept." *Zanoqwic v. Reno,* No. 97 Civ. 5292(JGK)(HBP), 2000 WL 1376251, at *2 (S.D.N.Y. Sept. 25, 2000) (citing cases); *see Tangorre v. Mako's, Inc.,* No. 01 Civ. 4430(BSJ)(DF), 2002 WL 206988, at *3 (S.D.N.Y. Feb. 8, 2002); *Torah Soft Ltd. v. Drosnin,* No. 00 Civ. 0676(JCF), 2001 WL 1425381, at *3 (S.D.N.Y. Nov.14, 2001) (noting that despite recent amendments to Rule 26(b) somewhat limiting its scope, the rule still allows for broad discovery).

In general, limitations on discovery are imposed only where the requested discovery is "sought in bad faith, to harass or oppress the party subject to it, when it is irrelevant, or when the examination is on matters protected by a recognized privilege."*In re Six Grand Jury Witnesses,* 979 F.2d 939, 943 (2d Cir.1992) (citing *Hickman v. Taylor,* 329 U.S. 495, 507-08, 67 S.Ct. 385, 91 L.Ed. 451 (1947)). Materials responsive to a discovery request will not be protected based on a claim of undue burden, unless the volume and time involved in production of the requested material are excessive. *See*Fed.R.Civ.P. 26(b)(2)(iii); *Jackson v. Edwards,* No. 99 Civ. 0982(JSR)(HPB), 2000 WL 782947, at *3 (S.D.N.Y. June 16, 2000). Further, where a party resists discovery of certain information, the burden is on that party to clarify and explain precisely why its objections are proper. *Cox v. McCleelan,* 174 F.R.D. 32, 34 (W.D.N.Y.1997) (quoting *Obiajulu v. City of Rochester,* 166 F.R.D. 293, 295 (W.D.N.Y.1996)). General and conclusory objections as to relevance, overbreadth, or burden are insufficient to exclude discovery of requested information.

### B. *Document Requests and Interrogatories*

**\*2** Pursuant to Federal Rule of Civil Procedure 34, a party may serve on any other party a request "to produce and permit the party making the request ... to inspect and copy, any designated documents" that are discoverable under Rule 26. Fed.R.Civ.P. 34(a). Similarly, a party may serve interrogatories that

"relate to any matters which can be inquired into under Rule 26(b)(1)."Fed.R.Civ.P. 33(c). Local Rule 33.3(a) of this Court restricts initial interrogatories to "those seeking names of witnesses with knowledge of information relevant to the subject matter of the action, ... and the existence, custodian, location and general description of relevant documents."

Under the Federal Rules, a party upon which interrogatories and/or requests for documents have been served must respond to such requests, in writing, within 30 days, and, if objecting, must state specifically the reasons for its objection. Fed.R.Civ.P. 33(b), 34(b).[FN1] Objections that are not timely stated may be deemed waived. *See*Fed.R.Civ.P. 33(b)(4); *Techsearch Servs, Inc. v.. Gorman,* No. 97 Civ. 7641(JSM)(KNF), 1999 WL 33024, at *2 (S.D.N.Y. Jan. 21, 1999) (failure to respond on a timely basis to a document request may result in waiver of any objections which could have been seasonably asserted). A party's failure to respond to discovery demands within the required time frame may, however, be excused by the Court for good cause.Fed.R.Civ.P. 33(b)(4); *see Techsearch Servs.,* 1999 WL 33024, at *2;*Davis v. City of New York,* No. 86 Civ. 6345(SWK), 1988 WL 42189, at *2 (S.D.N.Y. Apr.28, 1988) ("[T]he protections and sanctions found in the discovery rules are not absolute and contemplate the use of judicial discretion.").

> **FN1.** When a party fails to respond to discovery requests, Federal Rule of Civil Procedure 37 permits the requesting party to apply for an order compelling disclosure or discovery. Specifically, under Rule 37(a), a party may move to compel document production, disclosures required under Rule 26(a), or answers to interrogatories or deposition questions. Rule 37(a)(3) notes that "an evasive or incomplete disclosure, answer, or response is to be treated as a failure to disclose, answer, or respond."*Id.*

### II. *PLAINTIFF'S WAIVER ARGUMENT*

In this case, Melendez argues that defendants' objections to his discovery demands should be deemed waived as untimely. Plaintiff filed his first set of interrogatories and request for documents on March 18, 2002. (*See* Plaintiff's Letter Motion to

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)

Page 5

Compel Disclosure dated March 20, 2003.)
Defendants' response is dated September 4, 2002 (*see*
Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion to Compel dated Apr. 11, 2003
("Opp.Mem."), Ex. A), more than five months later.
Thus, defendants' response to Melendez's discovery
requests exceeded the 30-day time limit set forth by
the Federal Rules, and the Court did not specifically
grant an extension of time.

Although such a delay would normally result in
waiver of any objections, *see, e.g., Carr v. Queens-
Long Island Med. Group*, No. 99 Civ.
3706(NRB)(JCF), 2003 WL 169793, at *5 (S.D.N.Y.
Jan. 24, 2003); *Techsearch Servs.*, 1999 WL 33024,
at *2;*Smith v. Conway Org., Inc.*, 154 F.R.D. 73, 76
(S.D.N.Y.1994), the Court may, in its discretion,
excuse the delay, as noted above, *see supra* at
4;*Davis*, 1988 WL 42189, at *2.

[1] Here, the Court does not wish to penalize
defendants for failing to meet a discovery deadline,
where defendants may have misconstrued the Court's
earlier rulings and believed in good faith that they
need not have met that deadline. *See Billups v. West,
et. al.*, No. 95 Civ. 1146(KMW)(HPB), 1997 WL
177897, at *1 (S.D.N.Y. April 11, 1997) (finding that
defendants had not waived their objections where
there were other discovery extensions that could have
been misunderstood). The Court previously adjusted
other discovery deadlines in this case so that, among
other things, two "John Doe" defendants could first
be identified and then added to the case. It is possible
that defendants believed in good faith that these other
extensions excused their timely response to the
interrogatories and document requests at issue. In
addition, Melendez has not demonstrated that
defendants' delay in responding to his discovery
demands has been prejudicial to him in any way. *See
id.*For these reasons, and in the interest of justice, the
Court will consider defendants' objections to
Melendez's discovery demands.

III. *PLAINTIFF'S DISCOVERY REQUESTS*

A. *Requests Regarding Defendants' Prior Conduct*

(Interrogatories Nos. 6, 7, and 24, and Document
Requests Nos. 4, 5, 8 and 16)

*3 A number of Melendez's interrogatories and

document requests seek information regarding
defendants' prior conduct with respect to other
inmates. Although some of the requests are worded
generally, the more specific of these requests seek
evidence regarding complaints made against
defendants with respect to inattention to other
inmates' medical needs.

In generally-worded terms, Interrogatories Nos. 6 and
7 and the corresponding portions of Document
Requests Nos. 4 and 5 request information on "all
prior grievances, complaints, memoranda, notes,
and/or writings filed against each and all defendants
in the last five years," as well as the identity of all
persons in possession of this information.

Interrogatory No. 24 and the corresponding
Document Request No. 16 are more specifically
framed, requesting every court decision, decree, or
settlement agreement entered against defendants
regarding "acts of retaliation, deliberate indifference,
negligence, neglect and/or interference with medical
needs."

Finally, Document Request No. 8 requests the
production of DOCS records that reflect that an
individual defendant, in the course of employment
with DOCS, was charged or accused of "(a) having
acted in retaliation and/or maliciously; (b) neglect
and/or deliberate indifference to medical needs of
inmates; and (c) of having made false reports."

Defendants object to all of the above requests as
"unduly burdensome and overly broad," and also
contend "that the documents are privileged and
confidential, not reasonably calculated to lead to the
discovery of admissible evidence ...; [that] the
request calls for unsubstantiated charges and/or mere
allegations; that disclosure would constitute an
unwarranted invasion of privacy; [that] disclosure
would disrupt the order and effective functioning of
the correctional facility; and [that] the documents are
privileged and confidential under N.Y. Civ. Rights
Law § 50-a and the N.Y. Personal Privacy Law,
Public Officers Law § 91, *et seq.*, which as a matter
of comity, this federal court should recognize."(*See*
Opp. Mem. at 4-5, 8, Ex. A.)

1. *Relevance and Overbreadth*

Melendez has not demonstrated the relevance of

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)

other inmates' grievances or complaints against the defendants, to the extent such grievances or complaints relate to matters of a wholly different character than the matters alleged in his Complaint. In other words, Melendez has not shown why inmates' grievances having nothing to do with their medical needs would likely lead to discoverable information as to the defendants' practice, knowledge, or credibility on issues involving medical care.

[2] On the other hand, to the extent other inmates' grievances or complaints allege conduct similar to that alleged in the Complaint, and were similarly directed against any of the named defendants, the documents sought may well yield information relevant to the Melendez's claims, and such documents are therefore discoverable. *See, e.g, Cox, 174 F.R.D. at 34* (permitting discovery of prior similar complaints against defendants); *Malsh v. New York City Police Dep't*, No. 92 Civ. 2973(KTD)(AJP), 1995 WL 217507, at *1-2 (S.D.N.Y.Apt.11, 1995) (discovery of prior complaints and disciplinary actions against defendants was relevant to show "pattern, intent, absence of mistake, etc.") (quoting *Ismail v. Cohen*, 899 F.2d 183, 188 (2d Cir.1990)); *Hurley v. Keenan*, No. 79 Civ. 4772(RJW)(MHD), 1984 WL 358, at *3 (S.D.N.Y. May 8, 1984) (permitting discovery of prior similar administrative, civil, and criminal actions as relevant and potentially admissible to demonstrate defendants' intent and credibility and supervisory knowledge of misconduct).

*4 Moreover, the fact that any prior grievances against the defendants may not have led to official disciplinary action, or that charges were dismissed, would not in and of itself preclude discovery of this type of material. *Reyes v. City of New York*, No. 00 Civ. 2300(SHS), 2000 WL 1528239, at *2 (S.D.N.Y. Oct.16, 2000); *Cox*, 174 F.R.D. at 34;*Unger v. Cohen*, 125 F.R.D. 67, 70 (S.D.N.Y.1989) ("complaints that were abandoned or conciliated may not be admissible at trial, but that does not make them undiscoverable"; information about "accusations is an obvious source of 'leads' which resourceful [parties] may pursue to [discover] evidence bearing on intent or other facts in issue").

Overall, if appropriately narrowed to focus on the types of issues raised in the Complaint, Melendez's

request for documents and information regarding the grievances and complaints (including legal actions) of other inmates are relevant and should be permitted, unless defendants are able to show that the production would be unduly burdensome, that the documents in question are protected by some type of privilege, or that there is some other reason why, in the interest of justice, the requested documents should be withheld from disclosure.

### 2. Burden

As noted above, if the defendants wish to resist discovery on the ground of burden, then they must adequately demonstrate the nature and extent of the claimed burden. *See supra* at 3. Here, defendants have made no specific showing at all as to how disclosure of the requested documents and information would be particularly burdensome. *See Caines v. City of New York*, No. 01 Civ. 7229(RCC)(DFE), 2003 WL 151993, at *1 n. 1 (S.D.N.Y. Jan. 21, 2003) ("[C]onclusory assertion of burdensomeness is 'entitled to no weight whatsoever.'") (quoting *Jackson, 2000 WL 782947, at *3*). Further, limiting the defendants' document production and interrogatory responses to matters relevant to Melendez's claims will necessarily reduce any potential burden on defendants. For these reasons, the Court rejects defendants' boilerplate objection to production on the ground of burden.

### 3. Confidentiality

Defendants additionally argue that the requested information and documents should be protected from disclosure under New York Civil Rights Law § 50-a, a state statute mandating confidentiality for personnel records of correctional officers, and that this state law should be applied to this case as a matter of comity. (Opp. Mem. at 4-5, 8.) Similar arguments regarding the applicability of this state law are often raised in Section 1983 cases pending before this Court, as the conduct of state correctional officers is often at issue in such cases. *See, e.g., King v. Conde*, 121 F.R.D. 180, 188 (E.D.N.Y.1988) (citing *Inmates of Unit 14 v. Rebideau*, 102 F.R.D. 122, 129 (N.D.N.Y.1984)).Section 50-a, however, does not necessarily bar all federal discovery of officers' files. *See Billups v. West*, No. 95 Civ. 1146(KMW)(HBP), 1997 WL 100798, at *5 (S.D.N.Y. Mar. 6, 1997); *Malsh*, 1995 WL 217507, at *3;*Unger*, 125 F.R.D. at

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                     Page 7
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)

69-70;*Martin v. Lamb*, 122 F.R.D. 143, 145-46 (W.D.N.Y.1988); *Hurley*, 1984 WL 358, at *4.

**\*5** The Court first notes that state laws of privilege do not govern discovery in federal cases, and there is no federal counterpart to Section 50-a. *Mercado v. Div. of New York State Police*, 989 F.Supp. 521, 523 (S.D.N.Y.1998); *King*, 121 F.R.D. at 187 ("Questions of privilege in federal civil rights cases are governed by federal law."). While state law privileges may be recognized where there is no substantial cost to federal substantive and procedural policies, an automatic application of Section 50-a in this type of case would be in error and could in fact work to protect state officials against the enforcement of federal rights. *Mercado*, 989 F.Supp. at 523 (citation omitted); *King*, 121 F.R.D. at 187.

Nonetheless, recognizing that the state has an interest in protecting officers' personnel files from unnecessary "fishing expeditions" and disclosures, the Court may engage in a balancing test, on a case-by-case basis, to weigh the state's interest in protecting its employees' personnel information against a litigant's interest in obtaining information relevant to its civil rights claims. *Unger*, 125 F.R.D. at 69;*King*, 121 F.R.D. at 188-92;*Martin*, 122 F.R.D. at 146.

"[O]rdinarily the overriding policy is one of disclosure of relevant information in the interest of promoting the search for truth in a federal question case."*King*, 121 F.R.D. at 187 (quoting *Burke v. New York City Police Dep't*, 115 F.R.D. 220, 225 (S.D.N.Y.1987)). Moreover, federal policy favors disclosure particularly where, as here, the plaintiff is alleging a violation of constitutional rights. *See id.;Hurley*, 1984 WL 358, at *5. In order to counter this federal policy favoring disclosure, defendants must make a "substantial threshold showing" that there are "specific harms likely to accrue from disclosure of specific materials."*King*, 121 F.R.D. at 189 (citation omitted). This threshold showing may be made in the form of a declaration or affidavit by a responsible official, who is neither a defendant nor an attorney for a defendant, after independent review of the specific documents at issue. *Unger*, 125 F.R.D. at 70 (citations omitted); *King*, 121 F.R.D. at 189;*see Billups*, 1997 WL 100798, at *5. Only where this threshold is met, may the Court then review the documents *in camera* and decide which, if any, to

withhold from disclosure based on a balancing of competing interests. *Malsh*, 1995 WL 217507, at *3;*Unger*, 125 F.R.D. at 70;*King*, 121 F.R.D. at 189-90.

Here, defendants have made only a generalized objection under New York Civil Rights Law § 50-a. (*See* Opp. Mem. at 4-5, 8, Ex. A.) They have failed to make any specific showing regarding the nature of the requested documents and information, or to demonstrate how disclosure, as limited to prior conduct similar to that alleged in the Complaint, would expose protected personal information about the defendant officers. Indeed, it is not even clear that the requested information would be found in "personnel records," rather than in other types of files not covered by the state statutory provision. Even assuming, *arguendo*, that the requested information is contained in defendants' personnel files, Section 50-a, by its terms, does not shield from disclosure information that is found to be "relevant and material." New York Civil Rights Law § 50-a (3). Thus, the function of the statute is to prevent irrelevant materials from disclosure, not to offer a blanket protection of any and all information contained in an officer's records. *See King*, 121 F.R.D. at 192 (citing *Matter of Capital Newspapers v. Burns*, 67 N.Y.2d 562, 505 N.Y.S.2d 576, 496 N.E.2d 665 (Ct.App.1986)); *Hurley*, 1984 WL 358, at *5.

**\*6** In their opposition to Melendez's motion, defendants also cite "the informant's privilege, executive privilege, self-critical privilege and predecisional or deliberative privilege."(Opp. Mem. at 5.) Defendants, however, have not even submitted a privilege log, much less any evidence demonstrating that the elements of these types of privilege are satisfied here, and thus their assertion of privilege is substantially deficient. *See Jackson v. Edwards*, No. 99 Civ. 0982(JSW)(HBP), 2000 WL 782947, at *2 (S.D.N.Y. June 16, 2000); *King*, 121 F.R.D. at 189 ("The party seeking to invoke the privilege bears the burden of justifying its application.") (citing *Von Bulow v. Von Bulow*, 811 F.2d 136, 141 (2d Cir.1987)). Moreover, it is unclear whether the privileges cited even apply to the type of documents Melendez requests in this case. *See, e.g., James v. Tilgheman*, 194 F.R.D. 398, 401 (D.Conn.1999) (informer's privilege generally protects the identities of informants, not the contents

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)

of their statements, but it did not protect even the identities of inmates who had made grievances about the same kind of violation as that alleged by the plaintiff, because those prisoners were not observers or participants in the crime, but victims of the alleged conduct at issue); *Tortorici v. Goord*, 216 F.R.D. 256, 258 (S.D.N.Y.2003) (noting that the self-critical analysis privilege has led a checkered existence in federal court and its availability is an open question in this Circuit) (citations omitted); *Boyd v. City of New York*, No. 86 Civ. 4501(CSH), 1987 WL 6915, at *2 (S.D.N.Y. Feb.11, 1987) (allowing discovery of personnel files and evidence of prior assaults by the individual defendants despite the defendants' argument that the information should be protected under New York Civil Rights Law § 50-a and the self-analysis and executive privileges); *Jean D. v. Cuomo*, No. 90 Civ. 0861(SS)(BAL), 1993 WL 276067, at *2 (S.D.N.Y. July 20, 1993) (federal common law of executive and deliberative privilege apply only to "communications relating to policy formulation at the higher levels of government, it does not operate indiscriminately to shield all decision making by public officials"); *Nat'l Congress for Puerto Rican Rights v. City of New York*, 194 F.R.D. 88, 95 (S.D.N.Y.2000) (finding that the deliberative process privilege does not protect personnel decisions by law enforcement agencies).

In any event, to justify withholding evidence in a civil rights action, a claim of privilege must be so "meritorious as to overcome the fundamental importance of a law meant to insure each citizen from unconstitutional state action."*Jean D.*, 1993 WL 276067, at *2 (quoting *Skibo v. City of New York*, 109 F.R.D. 58, 61 (E.D.N.Y.1985)). Here, defendants' mere citation of various purported privileges, without any specific showing as to why such privileges would operate to protect particular documents or information, cannot justify withholding materials relevant to Melendez's civil rights claim.

*7 Overall, defendants have not shown that their generalized concerns regarding confidentiality or privilege override Melendez's right to discover relevant information necessary for the preparation of his case. As defendants have not satisfied their budern of justifying the application of any privilege, the Court will not shield the requested documents and information from disclosure based on Section 50-a or any other privilege. *See, e.g., Malsh, 1995 WL*

217507, at *3;*Unger*, 125 F.R.D. at 70;*King*, 121 F.R.D. at 196.[FN2]The parties may, however, stipulate that any produced records regarding charges against the defendants will be maintained as confidential and used only for purposes of this litigation. If the parties are unable to agree to the terms of a confidentiality stipulation to cover such documents and information, the Court will entertain a motion by defendants for an appropriate protective order.

> FN2. For the same reasons, the Court will not protect the material from disclosure under the New York Personal Privacy Protection Law, Public Officers Law § 91, *et. seq.*, which defendants also cite. (Opp. Mem. at 4.) *See Jackson*, 2000 WL 782947, at *2 (denying application of N.Y. Civil Rights law § 50-a and Public Officers Law § 91 because state law privileges do not control federal discovery disputes). Although defendants generally contend that the disclosures sought would constitute an unwarranted invasion of privacy, the information requested actually deals with officers' professional records, not with highly personal or private information. *See, e.g., Barry v. City of New York*, 712 F.2d 1554, 1562 (2d Cir.1983) ("We do not think that the right to privacy protects public employees from the release of ... information that is related to their employment ... nor do we think that the release of information that is not 'highly personal' rises to the level of a constitutional violation."); *King*, 121 F.R.D. at 191 (the release of officers' prior involvement in disciplinary proceedings does not involve a substantial privacy interest, especially in light of the role played by officers as public servants accountable to public review) (citing *Whalen v. Roe*, 429 U.S. 589, 598-600, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977)). Any particularly personal information regarding the officers, such as their home addresses, may be redacted from the records disclosed.

### 4. Institutional Safety Concerns

Finally, defendants argue that permitting disclosure of the requested materials "may result in the

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)

Page 9

disruption of order and effective functioning of the correctional facilities" and that "disclosure of this information my jeopardize institutional safety and correctional goals by, *inter alia*, dissuading individuals from cooperating with the Inspector General's Office."(Opp. Mem. at 5.) Once again, however, defendants have not articulated a specific basis for their concerns in this case, and the Court is unwilling to deprive Melendez of focused, meaningful discovery based on vague charges that disclosure of officers' records will necessarily jeopardize institutional safety. *See, e.g., King,* 121 F.R.D. at 192 (finding that courts should be wary of resisting disclosure based on fear of influencing officers' reporting candor because disclosure of relevant internal information to civil rights litigants is a minute influence on candor and may actually lead to improved honesty); *see also Wong v. City of New York,* 123 F.R.D. 481, 483 (S.D.N.Y.1989).

For all of the foregoing reasons, defendants are directed to produce documents responsive to Document Requests Nos. 4, 5, 8, and 16, and to respond to Interrogatories Nos. 6, 7, and 24, to the extent these discovery demands call for documents or information regarding grievances, complaints, investigations, or legal actions against any of the named defendants, relating to any charges that the defendants denied proper medical care to any inmates, retaliated against any inmates by depriving them of proper medical care, or were deliberately indifferent to, or otherwise neglected, any inmate's need for medical care.

B. *Information Relating to Defendants' Employment Duties*

(Interrogatories Nos. 8, 9, 18 and 23, and Document Requests Nos. 12 and 15)

Interrogatories Nos. 8 and 9 request the rules, regulations, and policies that relate to the duties, authorities, and functions of the defendants, and further request the identification of persons in possession of this information. The only burden described by defendants with respect to producing this information, apart from a generalized concern over its volume, is that Melendez has not limited his request to those rules, regulations, and policies that are actually relevant to his claims. (*See* Opp. Mem. at 5-6, Ex. A.)

*8[3] The Court agrees that these interrogatories, as posed, are overbroad. The Court, however, will grant Melendez's motion to compel responses, to the extent he is seeking prison rules and policy information relevant to his specific claims. Defendants should therefore respond to Interrogatory No. 8 by providing the requested rules, regulations and policies, to the extent they set forth the appropriate protocol to be followed by prison officers and personnel when inmates sustain physical injuries. *See, e.g. Cook v. City of New York,* 578 F.Supp. 179, 184 (S.D.N.Y.1984) (compelling response to a request for the citation of rules or regulations governing the New York City Department of Corrections conduct in the situation at issue).

[4] As for Interrogatory No. 9, which requests the identity of "each and all persons having possession of each and all rules, regulations, and/or policies," defendants should respond by describing, in general, where the relevant rules, regulations, and policies are maintained, and by stating if and how these rules, regulations, and policies are distributed or made available to correctional officers and others responsible for tending to inmates' medical needs.

Interrogatory No. 18 and Document Request No. 12 request all "contracts and/or agreements, concerning the services to be rendered, between the Department of Correctional Services and/or its agents with the employer(s) and/or defendants Dr. McGill, Mucci, M. Daniel, and each and all persons who allegedly provided and/or were designated to provide plaintiff with physical therapy."Defendants claim that they have already responded to these requests through their answers to Interrogatories Nos. 2 and 10.In response to Interrogatory No. 2, defendants identified the employers of certain defendants during the relevant time period; in response to Interrogatory No. 10, defendants provided Melendez with his medical files.

[5] It appears, however, that Interrogatory No. 18 and Document Request No. 12 seek information beyond that which has already been provided by defendants. Providing the names of the employers of certain individual defendants is not the equivalent of providing information regarding the services which those defendants were required to render, pursuant to their employers' contracts with DOCS. Nor,

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)**

presumably, does Melendez's medical file contain information regarding the range of medical services that defendants may have been contractually obligated to provide. Defendants are therefore directed to supplement their responses to Interrogatory No. 18 and Document Request No. 12, to the extent the requested contracts set out the medical services that defendants or any physical therapists were obligated to provide to inmates such as Melendez.

[6] Interrogatory No. 23 and corresponding Document Request No. 15 request information regarding the agencies that have employed defendants, the period(s) of defendants' employment, and defendants' salaries. To the extent these requests call for relevant information, defendants' responses have been adequate, and Melendez's motion to compel further responses is therefore denied.

### C. *Requests Regarding Medical Treatment*

(Interrogatories Nos. 5 and 10, and Document Request No. 5)

*9 Interrogatories Nos. 5 and 10, and to the extent that Document Request No. 5 corresponds, request information regarding physical evaluations and physical therapy recommendations made by defendant McGill regarding Melendez's injured hand, and the identification of those individuals who either provided Melendez with, or were "designated" to provide him with, physical therapy. Defendants do not contest the relevance of this information, but contend that Melendez should be able to derive the requested information from his medical records, which defendants have produced. (Opp. Mem. at 6, Ex. A.)

[7] It may be that the medical records are in fact sufficient to provide Melendez with the information requested. Assuming that any existing medical evaluations and recommendations are contained within the medical records that have been produced, defendants need not produce those documents again, nor identify the custodian(s) of such documents. The medical records, however, may not identify all physical therapists "designated" to provide Melendez with physical therapy, if physical therapy was supposed to be-but was not actually-provided. Therefore, to the extent defendants possess any

information regarding the physical therapy sessions that were allegedly "attended [by Melendez] and refused," defendants are directed to supplement their discovery responses.

### D. *Anticipated Trial Exhibits and Witnesses*

(Interrogatories Nos. 13, 14, 15, 16 and 17, and Document Requests Nos. 7, 9, 10 and 11)

Interrogatories Nos. 13, 14, 15, 16, and 17 and the corresponding Document Requests Nos. 7, 9, 10, and 11 ask defendants to identify the exhibits, witnesses, and experts that defendants expect to use at trial. Defendants have already partially responded to these requests, and argue that a further response would be premature.

[8] The Court agrees with defendants' position to the extent Melendez is seeking defendants' final exhibit or witness list for trial. Both parties are directed to review Judge Scheindlin's individual practices with respect to any required submission of a joint pretrial order, and are directed to make all necessary trial disclosures in accordance with those procedures.

[9] As for expert disclosures, it was the Court's understanding that discovery in this case-including expert discovery, if any-was completed some time ago, with the exception of any document production that may result from the within ruling. (*See* Transcript of March 3, 2003 Case Management Conference, at 9.) Defendants' counsel, however, now seems to have a different understanding, stating that it "reserves its right to disclose the applicable expert witness information within the time constraints set forth within the applicable federal rules."(Opp. Mem. at 10.) Under the circumstances, defendants' counsel is directed to inform Melendez and this Court, in writing, within one week of this Order, as to whether defendants intend to retain any trial experts in this case. If so, the Court will then set a new schedule that will ensure the prompt completion of all expert discovery.

### E. *Information Relating To Defendants' Answer*

(Interrogatories Nos. 19, 20, 21 and 22, and Document Requests Nos. 13 and 14)

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                    Page 11
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)
**(Cite as: Not Reported in F.Supp.2d, 2003 WL 22434101)**

**\*10** Interrogatories Nos. 19 through 22 and corresponding Document Requests Nos. 13 and 14 request the identity of witnesses with knowledge of the bases for defendants' denials of allegations contained in the Complaint, as well as information as to why defendants denied certain allegations, pleaded that they had insufficient knowledge to respond to other allegations, and raised the affirmative defense that Melendez had contributed to his own alleged damages. For the most part, these requests are not sufficiently specific to allow a focused response. Further, Interrogatories Nos. 20 through 22, which are akin to contention interrogatories, were premature when served. *See* Local Civil Rule 33.3(c).

[10] The Court notes, however, that, with the passage of time and the parties' completion of other discovery, it no longer makes sense to deny Melendez the opportunity to inquire into defendants' contentions. The Court also is aware that Melendez, as a *pro se* litigant, may not be skilled at drafting contention interrogatories. Therefore, although the Court will not require defendants to respond to these interrogatories as currently framed, Melendez may, if he wishes, serve appropriate contention interrogatories no later than two weeks from the date of this Order. Any such interrogatories should be narrowly tailored to elicit the bases for specific contentions made by defendants in this case.

### CONCLUSION

For all of the foregoing reasons, Melendez's motion to compel defendants to provide further discovery responses is granted to the following extent, and otherwise denied:

(1) No later than 30 days from the date of this Order, defendants shall serve Melendez with supplemental responses, as described and limited herein, to Interrogatories Nos. 5, 6, 7, 8, 9, 10, 18, and 24 and Document Requests Nos. 4, 5, 8, 12, and 16.

(2) No later than one week from the date of this Order, defendants shall inform the Court as to whether they intend to retain any expert witnesses in this case.

In addition, should Melendez wish to serve new contention interrogatories in proper form, he may serve such interrogatories no later than two weeks

from the date of this Order.

S.D.N.Y.,2003.
Melendez v. Greiner
Not Reported in F.Supp.2d, 2003 WL 22434101 (S.D.N.Y.)

END OF DOCUMENT

© 2008 Thomson/West. No Claim to Orig. U.S. Govt. Works.

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK: PART **54**
-------------------------------------------------------------------X
ROYAL INDEMNITY COMPANY, ROYAL
TNSURANCE COMPANY OF AMERICA and
WESTCHESTER FIRE TNSURANCE COMPANY,

     Plaintiffs,      Index No.: 125889/99

   -against-       **DECISION and ORDER**

SALOMON SMITH BARNEY, INC., as the
successor in interest to Smith Bamey, Inc.,
SALOMON SMITH BARNEY HOLDINGS, INC.,
and CITIGROUP, INC., as the successor in interest
to The Travelers, Inc., as the successor in interest
to Primerica *Corp.*,

     Defendants.
-------------------------------------------------------------------X
**SHIRLEY WERNER KORNREICH, J.:**

*I. FACTUAL AND PROCEDURAL BACKGROUND:*

  In this action, plaintiffs Royal Indemnity Co., Royal Insurance Co. of America and

Westchester Fire Insurance Co. (collectively, "the plaintiffs," "the insurers" or "Royal") seek a

declaration that they are not obligated to provide coverage under certain excess liability insurance

policies to one or more of Smith Barney, Inc. ("Smith Barney"), The Travelers Group, Inc., The

Travelers, Inc. and Primerica Corp. (collectively, "the defendants," "the insureds," "SSB" or "the

Citigroup defendants") relative to claims arising from the settlement of two gender

discrimination/sexual harassment class actions brought against defendants by 1920 female

employees.' Plaintiffs' defenses to coverage are: (1) that they **did** not receive timely notice of the

_____

  'The Travelers Group, Inc., The Travelers, Inc., Travelers Casualty & Surety Co., Gulf
Insurance Company ("Gulf") and Primerica Corp., formerly named as defendants, have since
been dismissed from the case by Order of the Supreme Court, New York County (Schoenfeld, J.)

claims, as required by the terms of the policies; (2) that the insureds have not shown that the underlying insurance was properly and fully exhausted[2]; and (3) that the underlying claims either are not within the coverage provisions of the policies or else are excluded from coverage. The sole question at issue on this application is what discovery should be made available by defendants to plaintiffs relative to the latter's claim that notice was untimely. It is plaintiffs' position that defendants were aware at least eleven months before calling upon plaintiffs' excess policies that a resolution of the underlying gender-discrimination claims would exceed their primary coverage. Defendants, on the other hand, insist that they did not become aware of the magnitude of the class action plaintiffs' claims until late January or February 1997, such that their notice to Royal in late March 1997 was timely.

### A. Facts:

Between 1989 and 1997, plaintiffs issued to defendants a number of excess liability insurance policies ("the Excess Policies") which allegedly covered, inter alia, any gender-based

---

dated August 29, 2001; and on June 4, 2001, plaintiffs voluntarily discontinued their claims against another defendant, Hartford Accident and Indemnity Co. Smith Barney, Inc. is allegedly the predecessor in interest of defendant Salomon Smith Barney, Inc., a wholly-owned subsidiary of defendant Salomon Smith Barney Holdings, Inc., which in turn is a wholly-owned subsidiary of defendant Citigroup, Inc. In addition, Citigroup, Inc. is allegedly the successor in interest to Travelers Group, Inc., the successor in interest to The Travelers, Inc., the successor in interest to Primerica *Corp.*

[2]During the relevant time period, Salomon Smith Barney's primary liability coverage was provided by Gulf (from April 1, 1993 to April 1, 1994) and then by Travelers Indemnity Company of Illinois ("Travelers") (from April 1, 1994 to April 1, 1997). So far as can be told from the instant record, the primary insurers have defended and indemnified Salomon Smith Barney for the underlying claims and have notified Royal of the exhaustion of the applicable "personal injury" limits of their coverage. It is part of plaintiffs' theory of their case that the insureds placed the interests of their corporate siblings and primary insurers, Travelers and Gulf, ahead of plaintiffs' interests by improperly exhausting the primary policies in order to reach the excess policies.

employment discrimination claims that might be asserted against their insureds.

On May 20, 1996, Pamela Martens and three other female employees of Smith Barney and/or of Shearson Lehman Brothers ("Shearson")[3] commenced a "class action" in the United States District Court for the Southern District of New York against Smith Barney, alleging an assortment of gender-based employment claims ranging from sexual harassment, gender discrimination, disparate treatment and retaliation (Martens v. Smith Barney et al., hereinafter "Martens"). Thereafter, on October 28, 1996, an additional six female employees of Smith Barney and/or Shearson filed a similar class action in the United States District Court for the Northern District of California, entitled Alvarez v. Smith Barney et al. ("Alvarez"). At about the same time, a second amended complaint was served in Martens adding nineteen new plaintiffs to the action. Both lawsuits sought restitution, past and prospective compensatory damages for lost wages and benefits, punitive damages, attorney's fees and other related damages on behalf of all plaintiffs. Neither specified a monetary figure.

The insureds allege that they first learned of the magnitude of the amounts demanded in the Alvarez and Martens litigations (collectively, "the class actions") in late January or February of 1997. Plaintiffs, on the other hand, contend that the insureds were aware that the class actions would be seeking "millions" even before the first complaint was filed in May of 1996, inter alia because the insureds held pre-suit settlement discussions with counsel for the class action plaintiffs. In either event, the insureds sent the first notice to plaintiffs regarding possible implication of their excess coverage on March 25th or March 26th, 1997. Plaintiffs allege that they received this notice on April 3, 1997. Plaintiffs further contend that the insureds and/or

---

[3] Smith Barney acquired Shearson on July 31, 1993.

Citigroup retained counsel to represent SSB in the <u>Martens</u> action some time between the filing of the <u>Martens</u> lawsuit and the initial April 3, 1997 notification to plaintiffs. SSB was represented in both class actions by the firm of Paul, Weiss, Rifkind, Wharton & Garrison ("Paul, Weiss"), as well as, to an unspecified degree, by in-house counsel. In <u>this</u> action, SSB is represented by Skadden, Arps, Slate Meagher & Flom ("Skadden, **Arps**").

On June 26, August 12 and August 15, 1997, plaintiffs attended meetings with other insurers and the insureds regarding possible settlement of the class actions. On August 15, 1997, the insureds demanded that plaintiffs provide coverage for the class actions. On or about September 10, 1997, plaintiffs sent a letter to the insureds in which they (1) disclaimed coverage on the ground that the insureds had provided plaintiffs with untimely notice; and (2) reserved their rights to assert any and all available defenses.

On November 18, 1997, the insureds and the class action plaintiffs reached a settlement agreement which was approved by the United States District Court for the Southern District of New York on July 24, 1998. The settlement established a "Dispute Resolution Process" ("DRP"), consisting of mediation followed by binding arbitration, in which the claims of the (now) 1920 class members would be individually resolved. The settlement did not otherwise adjudicate the class members' claims or establish any limitation to the fund out of which they could be compensated. As of October 22, 2003, 1851 of the 1920 cases had been settled; six claims had gone to arbitration; and 69 claims remained open. <u>See</u> Exhibit D to Leonard Reply Affirmation.

### B. Procedural History:

#### 1. Background of the instant discovery dispute:

4

Plaintiffs commenced the instant declaratory judgment action on or around December 30, 1999.

In their efforts to ascertain <u>when</u> defendants became aware that the underlying class action claims were so large as to implicate their "excess" coverage, plaintiffs called for discovery concerning, <u>inter alia,</u> settlement demaiids by and discussions held with the class action plaintiffs, both before and after the class actions werc filcd. <u>See, e.g.,</u> plaintiffs' Notice for Discovery and Inspection dated June 9, 2000, appended to plaintiffs' motion papers as Exhibit I, no. 24. In response, SSB refused to produce any such discovery, invoking in their responses to plaintiffs' discovery demands the attorney-client privilege, the work product doctrinc, the joint-defense privilege, and "any other applicable privilege or immunity." & Exhibit J, no. 24. Defendants also objected to producing the requested evidcnce because "such materials constitute confidential scttlement discussions not subject to disclosure." <u>Id.</u>  SSB raised similar "blanket" objections to plaintiffs' interrogatorics requesting a description of all communications with the class and/or its representatives concerning settlement, both pre- and post-filing of the class actions.  In support of their refusal to describe any such communications, plaintiffs cited, <u>inter</u> <u>alia,</u> the attorney-client privilege, the work product doctrine, and settlcment-confidentiality. <u>See</u> plaintiffs' Exhibit K, nos. 1, 2, 3, 7, **8, 12,** 26, 27, 28.

By letter dated December 8, 2000, plaintiffs demanded that SSB provide a "privilege log," identifying all documents being withheld from production on thc basis of <u>any</u> asserted privilege. <u>Sce</u> plaintiffs' Exhibit L. Following telephone conferences and further correspondence, by letter dated December 21, 2000 defendants notified plaintiffs, <u>intcr alia,</u> that thcir communications with class members qualifying as "settlement discussions" would be

5

neither produced nor logged. See plaintiffs' Exhibit N at 2. In April 2001, defendants supplied two privilege logs, neither of which contained any entries concerning settlement demands and/or discussions dating from either before or after the class actions were filed. See Plaintiffs' Exhibit O, Affirmation of Timothy Reynolds, at 4-6.

### *2. Plaintiffs' first discovery motion and Justice Schoenfeld's December 26, 2002*

### Order:

In March 2001, plaintiffs filed a motion to sanction the Citigroup defendants for their refusal to produce the missing "settlement" and other documents. Defendants countered plaintiffs' arguments by arguing that all of their settlement discussions with the underlying class action plaintiffs were per se immune from discovery because of the generalized "settlement privilege" enunciated in CPLR 94547. Defendants also contended that they had received no settlement demand(s) in either of the class actions until January or February of 1997. See plaintiffs' Exhibits O at ¶17, P at 8.

In a Decision and Order dated December 26, 2002, the Supreme Court, New **York** County (Schoenfeld, J.) resolved all pending motions, including the motion regarding the parties' dispute over "settlement-related" documents. See plaintiffs' Exhibit Q. While denying plaintiffs' request for sanctions, the Court ordered as follows:

> The Insureds and/or the Citigroup Defendants are directed to disclose the communications with the Class Action plaintiffs and their counsel both prior to the commencement of the Class Actions and in the process of settlement. This information is material and necessary to the issue of defendants' knowledge of the scope of the liability and the likelihood that the excess coverage would be implicated.....
> All disclosure directed hereinabove shall be produced within 60 days of the issuance of this decision....

Plaintiffs' Exhibit Q at 7, 10. Plaintiffs extended defendants' deadline until March 14, 2003.

See Affidavit in Support of Plaintiffs' Motion by Jeffrey Leonard at 11.

    *3. Post-motion discovery:*

On March 11, 2003, the SSB and Citigroup defendants served a "First Supplemental Response[]" to plaintiffs' June 2, 2000 Notice for Discovery and Inspection. See plaintiffs' Exhibit R. The "Supplemental Response[]" is a seven-page list of "objections" to plaintiffs' disclosure requests, both in general and in particular, on grounds including but not limited to attorney-client privilege, work-produce doctrine, joint-defense privilege, relevance, confidential information, proprietary information, business/commercial secrets, prematurity, overbroadness, vagueness, misleadingness, overly burdensomeness, argumentativeness, oppressiveness, and as violative of constitutional, statutory and/or common law privacy concerns. Insofar as plaintiffs' specific request for documents reflecting settlement discussions was concerned, defendants wrote:

> 24. SSB refers plaintiffs to the Objections and Responses of Defendant Salomon Smith Barney, Inc. to Plaintiffs' Joint Notice of Discovery and Inspection, dated November 27, 2000.[4] In addition, SSB will make available to plaintiffs relevant non-privileged documents at a mutually convenient time and location.

Plaintiffs' Exhibit R.

On April 8 and 9, 2003, defendants produced several of the documents encompassed by Justice Schoenfeld's Order, but no documents concerning settlement demands and negotiations.

On April 16, 2003, plaintiffs' attorney Jeffrey Leonard wrote a letter to defendants'

---

[4]As indicated above, that earlier response objected to supplying any settlement-related materials on the ground that all were protected from disclosure by the attorney-client privilege, the work product doctrine, the joint-defense privilege, and the general privilege applicable to "confidential settlement discussions." See Plaintiffs' Exhibit J.

counsel in which he listed the categories of deficiency in defendants' latest document production.

See Plaintiffs' Exhibit S. Among other things, Leonard complained that

> The Citigroup Defendants have not produced a single document concerning communications with the class representatives or their counsel regarding settlement negotiations and demands, prior and subsequent to the commencement of the Class Actions. Id.

On April 17,2003, SSB's Skadden, Arps counsel, Timothy Reynolds, responded that

Royal had been allowed to review the voluminous file maintained by SSB's in-house counsel

even prior to Justice Shoenfeld's December 26,2002 Order; that said file had presumably

contained the requested materials; and that the entire file had since been destroyed in the

September 11, 2001 World Trade Center attack, In addition, Reynolds contended, after Justice

Schoenfeld's Order, Royal had been "given access to the files of Paul, Weiss, counsel to SSB in

the class action. To the extent that information or correspondence exists concerning

communications with the class representatives or their counsel, it would have been in that

production." See plaintiffs' Exhibit T.

Leonard replied on April 22, 2003, inter alia, that the volume of defendants' prior

document production was irrelevant where Court-ordered materials were not among the records

produced. Leonard wrote:

> ... I can only reiterate that the Citigroup Defendants still have not produced a single document concerning communications with the class representatives or their counsel regarding settlement negotiations and demands, prior and subsequent to the commencement of the class actions. The Citigroup Defendants refused to produce or even log these documents, claiming 'settlement privilege.' Their objections were overruled when the court ordered that all such documents be produced. You refer to the World Trade Center tragedy, but do not appear to contend now - and never advised the court prior to the December 26, 2002 Order - that any, let alone all, of the documents (as well as all copies of the same) that were the subject of the Citigroup Defendants' 'settlement privilege' claim were destroyed. The only Paul Weiss files that have been produced to date

8

are files containing litigation documents and the files that we received the week of April 7,2003. No correspondence or notes or memoranda of communications with the class plaintiffs or their representatives have been produced.

Plaintiffs' Exhibit U.

## II. *DISCUSSION:*

At issue on this application are two categories of documents:

(1) Records relating to settlement demands and negotiations with the class plaintiffs, both before and after the class actions were filed. The five settlement-related documents sought by plaintiffs here bear Bates numbers SSB 866490 - SSB 866491, SSB 866492 - SSB 866495, **SSB 866496 - SSB 866510**, SSB 866511 - SSB 866519, and SSB 866520 - **SSB 866523**. These are apparently memos drafted between December 13, 1996 and March 3, 1997 by SSB's Paul, Weiss attorneys. Plaintiffs only learned of the existence of these documents in the fall of 2003, pursuant to a third-party subpoena served by them on Paul, Weiss. The documents were promptly labeled "privileged and work product" by defendants, who entered them onto their Supplemental Log dated November 13, 2003. All five of these documents -- which pre-date defendants' April 1997 notice to defendants of the existence of the class actions -- are described as reflecting communications with class counsel, including telephone calls and settlement meetings.

(2) Documents listed on defendants' privilege logs relating to their evaluations of the gender-based claims ("assessment-related documents"). These documents include materials reflecting defendants' assessments over time of the class actions, their subsequent projections of the costs of settling the claims of the 1920 women who agreed to engage in an alternative dispute resolution process, and their bases for settling 1851 of said claims.

9

### *A.  The Five "Settlement-Related" Documents:  Waiver and Law of the Case:*

With respect to the settlement-related documents: Although the Citigroup defendants

included "attorney-client privilege" and "work product" in their boilerplate responses to

plaintiffs' demands to discover settlement-related documents, they abandoned those objections

in, inter alia, their opposition to Royal's motion for sanctions — where they refused to produce the

requested discovery solely on the ground of settlement-discussion confidentiality under CPLR

§4547.[5]  See Plaintiffs' Exhibits N, O, P.  In response to defendants' argument, Justice

Schoenfeld ruled in December 2002 that the defendants were "to disclose the communications

with the Class Action plaintiffs and their counsel both prior to the commencement of the Class

Actions and in the process of settlement" within 60 days.  Defendants' current suggestion that by

this directive the Court meant only to free the settlement-related documents from the "settlement

privilege" but not from the attorney-client and/or work product privileges is disingenuous.  In

their opposition to plaintiffs' motion, defendants had raised only the "settlement privilege,"

effectively waiving the others.

Equally unpersuasive is defendants' related suggestion that, because of the wording of his

ruling, Justice Schoenfeld intended to limit the "settlement-related" discovery to only

correspondence between counsel for the defendants herein and counsel for the underlying class

---

[5]The Court notes that the CPLR 4547's prohibition against admitting at trial evidence of
settlement negotiations expressly declares the prohibition to be inapplicable when "such evidence
... is offered for mother purpose, such as negating [or substantiating] a contention of undue
delay...."  Plaintiffs require evidence of settlement negotiations not "as proof of liability for or
invalidity of the claim or the amount of damages," but rather to establish when defendants had
reason to suspect that the class action plaintiffs' claims were likely to exceed the coverage
provided by their primary carriers (i.e., to substantiate their claim that SSB's notice to its excess
carrier was "unduly delayed').

10

action plaintiffs – i.e., impliedly leaving protected by the "settlement privilege" all communications regarding settlement among and between SSB's various departments and its complicated network of lawyers (e.g., in-house counsel, Travelers' Law Department, Gulfs legal staff and Paul, Weiss). In fact, the dispute at issue in plaintiffs' original motion concerned plaintiffs' demands for discovery of all "information concerning the settlement negotiations between SSB and the class action plaintiffs." Emphasis supplied; see Reynolds Affirmation in Opposition, dated **April** 5, 2001, Exhibit O to Plaintiffs' Motion, at 11. To the extent that the wording of Justice Schoenfeld's Order suggests that his disclosure directive was limited to references to settlement in defendants' correspondence with counsel for the class action plaintiffs and no one else, the Court concludes that the sentence was inartfully composed, as it would make no sense to direct the disclosure of some kinds of settlement information while forbidding the release of other, presumably related data.

In opposition to plaintiffs' motion, defendants propose a number of alternative theories as to why settlement-related documents should not be turned over to plaintiffs, all of which are without merit.

For example, defendants reiterate their contention that in early 2002, SSB's General Counsel made some 262,000 pages of documents available to Royal at **SSB's** World Trade Center offices, but that Royal only reviewed and requested copies of 68,000 pages. For all anyone knows, defendants argue, the settlement records now being sought were in the documents that were made available but that Royal did not bother to look at, with the result that Royal has waived its right to receive any settlement-related paperwork. However – as plaintiffs point out and defendants do not deny -- defendants at all times declared that settlement materials were "off

11

limits" to plaintiffs and would not be produced. Accordingly, there is no reason to believe that settlement-related records were among the documents produced by defendants and spurned by plaintiffs in early 2001, such that plaintiffs should now be barred from requesting them. Moreover, if such records were indeed posted in 2001, defendants would thereafter have waived any privilege with regard to them.

SSB then goes on to conjecture that when its offices were consumed in the World Trade Center conflagration on September 11, 2001, everything concerned with settlement was destroyed. However, as plaintiffs argue, there is no proof of this; and there is further no explanation for why defendants would not have maintained copies of the possibly-destroyed settlement communications at other offices belonging to SSB, Travelers, Gulf and/or Paul, Weiss. See Independent Petrochemical Corp. v. Aetna Cas. & Sur. Co., 654 F.Supp. 1334, 1364 (D.D.C. 1986) (court unpersuaded by party's "insufficient showing," or "pure speculation," that discoverable documents "were in fact destroyed and that duplicates do not exist").

The Court therefore finds that defendants waived their "attorney-client" and work-product" arguments relative to "settlement-related documents" in their prior response to plaintiffs' sanctions motion before Justice Schoenfeld. Finally, Justice Schoenfeld's Order of December 26, 2002 directed defendants to produce all "information concerning the settlement negotiations," and said order is the law of the case. Accordingly, defendants are directed to turn over copies of the above-listed settlement-related documents to plaintiffs within 30 days of receipt of a copy of this order with notice of entry.

### B. Assessment-Related Discovery

#### 1. The Attorney-Client Privilege:

12

Defendants also seek to withhold documents reflecting their "assessments" of the class

action plaintiffs claims, on the grounds that such evaluations are protected by the attoniey-client

privilege. See CPLR 3101(b), (c), CPLR 4503.

As a preliminary matter, the Court regards SSB's "assessments" of the various gender

discrimiliation claims to be the "flip side" of the "settlement-related information" issue discussed

above, In other words, it stands to reason that once a settlement "demand" was made by a class

action plaintiff, an "assessment" by SSB would have followed, after which "negotiations" would

have ensued. And, indeed, several of the documents listed on the privilege logs have such hybrid

descriptions as "Case Assessment/Report reflecting legal advice re: Settlcinent offer analyses." If

"settlement-" and "negotiation-related" documents are discoverable pursuant to Justice

Schoenfeld's ruling, it stands to reason that documents reflecting claim "assessment" – the

intemiediate stage between "demand" aiid "negotiation" – should be discoverable as well, as **part**

of the "information concerning settlement negotiations" that Justice Schoenfcld ordered

disclosed.

The attomey-client privilege may only be invoked where the party asserting it establishes

that the document at issue reflects a communication made in confidence between an attorney and

his client, aiid that it was made primarily to assist in obtaining or providing legal advice or

services for the client. See Spectrum Systems International Corp. v. Chemical Bank, 78 N.Y.2d

371, 377 (1991); All Waste Systems, Inc. v. Gulf Insurance Company, 295 A.D.2d 379, 380 (2d

Dept. 2002). To establish that documents are immune from discovery under the attorney-client

privilege, the party pressing for non-disclosure "must establish that the information sought would

divulge confidential attomcy-client communications" made "for the purpose of facilitating the

13

rendition of professional legal services to the client." Bloss v. Ford Motor Company, 126 A.D.2d 804, 805 (3d Dept. 1987); Vermont Gas Systems, Inc. v. U.S. Fidelity & Guar. Co., 151 FRD 268,274-275 (D.Ver. 1993). Indeed, the privilege covers *only* "materials prepared by an attorney, acting as an attorney, which contain his analysis and trial strategy." Salzer ex rel. Salzer v. Farm Family Life Ins. Co., 280 A.D.2d 844, 846 (3d Dept. 2001); see also Lamitie v. Emerson Elec. Co., 208 A.D.2d 1081, 1083 (3d Dept. 1994) (third-party investigation does not constitute attorney work product). Materials that could have been prepared by a lay person, even if prepared by an attorney, do not qualify for the privilege. Bloss v. Ford, supra.

It is not disputed that SSB's/Travelers' "Law Department" investigated the underlying gender-based claims from their inception, pursuant to an internal policy, memorialized in a Memorandum dated December 1, 1994, requiring the Law Department to "manage" all "extended personal injury claims." Even were the Court to credit defendants' counsel's unsupported assertion that all assessments performed by defendants' Law Department in the course of their routine "management" of these claims contain attorney-client confidences, the Court would conclude that any assessment-related materials that pre-dated September 10, 1997 -- when Royal disclaimed coverage -- would be discoverable by Royal under the "common interest" doctrine. According to that doctrine, communications between an insured and its attorney connected with the defense of underlying litigation are normally not privileged vis-a-vis the insured's carriers in subsequent litigation. See, e.g., Eureka Investment Corp. v. Chicago Title Ins. Co., N.V., 743 F.2d 932,936-937 (D.C. Cir. 1984); Independent Petrochemical Corp. v. Aetna Cas. and Sur. Co., 654 F.Supp. 1334 (D.D.C. 1986), aff'd 944 F.2d 946 (D.C. Cir. 1991), cert. den. 503 U.S. 1011 (1992); Car & General Ins. Corp. v. Chicago Title Ins. Co., 179 F.Supp.

14

888,890-891 (S.D.N.Y. 1959), aff'd 277 F.2d 162 (2d Cir. 1960); Truck Ins. Exchange v. St.

Paul Fire & Marine Ins. Co., 66 F.R.D. 129, 133-136 (E.D.Pa. 1975); Southeastern Pennsylvania

Transp. Auth. v. Transit Cas. Co., 55 F.R.D. 553,557 (E.D.Pa. 1972).

      "The crux of this dispute is whether the 'common interest' doctrine trumps [defendants']

claims of privilege where there is admittedly a common interest between the insurers and

insureds in minimizing exposure in the underlying [gender-discrimination] claims, but where

there is also sharp dispute between insurers and insureds regarding insurance coverage."

Independent Petrochemical Corp., supra, at 1365. The Court finds that at least up until the time

that Royal disclaimed coverage on September 10, 1997, **SSB** and its primary insurers did not

prepare their documents expecting that their assessments and settlement postures would be

concealed from their excess insurance carriers. Rather,

> [t]he documents were generated in anticipation of minimizing something of
> common interest to both [defending] parties in [the underlying] suit[s]: exposure
> to liability from tort claimants. In short, [defendants] had no reasonable
> expectation of confidentiality with regard to these documents.

Id. Indeed, the record reveals that up until September 10, 1997, Royal was a participant in

negotiations among and between the class action plaintiffs, SSB, SSB's lawyers and SSB's

primary carriers, attending settlement meetings with them on June 26, August 12, and August 15,

1997. Accordingly, the pre-September 10, 1997 "settlement-" and "assessment-"related

documents for which attorney-client privilege is now being claimed are not privileged because

they were not "prepared in an atmosphere of uncertainty as to the scope of any identity of interest

shared by the parties." See Vermont Gas Systems, Inc., supra, at 277; cf. Bovis Lend Lease,

LMB, Inc. v. Seasons Contracting Cow., 2002 WL 3172693 (S.D.N.Y.December 5, 2002).[6]

However, as discussed below, because the Court concludes that all of the assessment-related material on defendants' logs is covered by the "at issue" doctrine, it directs release of the post-September 10, 1997 documents as well.

### 2. The Work Product Doctrine:

The work product doctrine is distinct from and broader than the attorney-client privilege. Firstly, although only confidential communications between the attorney and client are protected by the attorney-client privilege, the work product doctrine may encompass any document prepared in anticipation of litigation by or for the attorney. Secondly, while the attorney-client privilege belongs only to the client, either the client or the attorney may assert the work-product privilege. See Vermont Gas Systems, Inc. v. U.S. Fidelity and Guar. Co., supra; CPLR §4503, CPLR §3101(b), (c), (d)(2). Thirdly, the attorney-client privilege is considered "absolute," while the "work product" doctrine is "conditional." See McKinney's Cons Laws of New York, Practice Commentary C3101:26-C3101:29.

The "work product" doctrine applies only to documents that were prepared "principally or exclusively to assist in anticipated or ongoing litigation," and is not designed to protect

---

'Added to this category of discoverable materials are all records for which the "attorney client privilege" is invoked on defendants' logs that are missing the name of the sender, the name of the recipient, and/or the date. Clearly, where the parties to the communication are unclear, no attorney-client privilege can be asserted. See Stenovich v. Wachtel, Lipton, Rosen & Katz, 195 Misc.2d 99 (Sup. Ct., N.Y. Co., 2003) (document in party's "privileged log" whose author was identified by only four initials is not protected by either attorney-client or work-product privilege). Additionally, where the date is missing, it must be presumed (in the absence of clear evidence to the contrary) that the communication antedated the September 10, 1997 cut-off date, since New York's liberal discovery statutes would require any "presumption" to favor disclosure.

16

.

documents prepared in the "regular course of business" (including claim investigations). In other words, "if a party prepares a document in the ordinary course of its business, it will not be protected even if the party is aware that the document may also be useful in the event of litigation." See Martin v. Valley National Bank of Arizona, 140 F.R.D. 291, 304 (S.D.N.Y. 1991). "As for 'anticipation of litigation,' courts have made clear that, because litigation can be anticipated at the time almost any incident occurs, a substantial and significant threat of litigation is required before a discovery opponent's anticipation will be considered a reasonable and justifiable motivation for production of a document." Harper v. Auto-Owners Ins. Co., 138 F.R.D. 655, 659 (S.D. Ind. 1991). "[T]he test should be whether, in light of the nature of the document and the factual situation in the particular case, the documents can fairly be said to have been prepared or obtained because of the prospect of litigation." The privilege is not necessarily vitiated by the fact that the document was prepared in anticipation of litigation with another **party** rather than with the parties to the current lawsuit, since work product protection applies to materials prepared for an earlier action where the actions are closely related in parties and/or subject matter. See F.T.C. v. Grolier, Inc., 462 U.S. 19, 25 (1983); see also Hercules, Inc. v. Exxon Corporation, 434 F.Supp. 136, 153 (D. Del. 1977); Slate v. State, 268 A.D.2d 857 (3d Dept. 2000) ("an attorney's work product is privileged both in the context of the litigation for which it was prepared and in that of any subsequent legal proceedings"); Corcoran v. Peat, Marwick, Mitchell & Co., 151 A.D.2d 443, 445 (1st Dept. 1989). In the instant case, the tort actions between the class action plaintiffs and SSB are clearly related to the within declaratory judgment litigation between Royal and **SSB**.

However, the Court concludes that only assessment documents post-dating May 20, 1996

17

could qualify for work product status, because only after May 20, 1996 could "assessments" be

considered to have been created in a context of "objective facts establishing an identifiable

resolve to litigate." Harper v. Auto-Owners Ins. Co., supra. As the Court observed in

International Surplus Lines Insurance Co. v. Willis Corroon Corp., 1992 WL 345051 (N.D.Ill.

Nov. 12, 1992) -- citing Binks Mfg. Co. v. National Presto Industries, Inc., 709 F.2d 1109, 1118

(7th Cir. 1983), and Janicker v. George Washington University, 94 F.R.D. 648, 650 (D.D.C.

1982) -- to qualify for the "work product" privilege, a discovery opponent must show that "'the

primary motivating purpose behind the creation of a document must be to aid in possible future

litigation,' under circumstances where the discovery opponent can show 'objective facts

establishing an identifiable resolve to litigate.'" The first such qualifying "objective fact" in the

record before the Court is commencement of the Martens class action on May 20, 1996. See also

Bovis Lend Lease. LMB. Inc. v. Seasons Contracting Corp., supra.[7]

Notwithstanding the foregoing, the Court concludes that all documents regarding

assessment and settlement marked "work product" in defendants' privilege logs -- even those

generated after May 20, 1996 -- are subject to disclosure, because they qualify for both the "at

issue" and "substantial need" exemptions from privilege, as discussed below.

### C. The "At Issue" and "Substantial Need" Exceptions:

#### 1. "At Issue":

Under the "at issue" doctrine, the attorney-client privilege and the work product doctrine

can be deemed to be waived where a party advances claims or defenses that place protected

---

[7]As with the "attorney-client" privilege, undated documents or records lacking a clearly
identifiable sender and/or recipient would not qualify for the "work product" privilege.

information "at issue" – that is, "where invasion of the privilege is required to determine the validity of the client's claim or defense and application of the privilege would deprive the adversary of vital information." IMO Industries. Inc. v. Anderson Kill & Olick, P.C., 192 Misc.2d 605, 609 (Sup. Ct., N.Y. Co. 2002); see also Orco Bank, N.V. v. Proteinas Del Pacifico, S.A., 179 A.D.2d 390 (2d Dept. 1992); Bowne of New York City, Inc. v. AmBase Corp., 150 F.R.D. 465 (S.D.N.Y. 1993). As the privilege-exception is sometimes formulated, a party is treated as having waived its privileges where: (1) assertion of the privilege was the result of some affirmative act [here, defendants' claims against their excess carriers] by the non-disclosing party; (2) through this affirmative act, the non-disclosing party put the protected information at issue; and (3) application of the privilege would have denied the opposing party access to information vital to its ability to resist the non-disclosing party's affirmative act. See Remington Arms Co. v. Liberty Mutual Ins. Co., 142 F.R.D. 408, 414, fn. 4 (D.Del. 1992).

In the matter at bar, the defendants bear the burden of establishing that the notice they provided to plaintiffs was timely under the notice provisions of the policies, since timely notice is a "condition precedent" to coverage. See City of Utica v. Genesee Management. Inc., 934 F.Supp. 510, 519 (N.D.N.Y. 1996); SSBSS Realty Corp. v. Public Serv. Mut. Ins. Co., 253 A.D.2d 583 (1st Dept. 1998). In order to carry their burden, defendants will have to establish that the timing and quantity of the demands they received from the class action plaintiffs, and the assessments made of these demands by defendants' own counsel, made it reasonable for notice to have been withheld from plaintiffs until late March of 1997. Defendants cannot establish that they provided timely notice to Royal while at the same time refusing to disclose the information that would either prove or disprove that threshold assertion. See Byers v. Burleson, 100 F.R.D.

19

436 (D.D.C. 1983) (privilege waived where information sought was necessary to resolve issue essential to the non-disclosing party's case).[8]

In Vermont Gas Systems, Inc., supra, an insured (plaintiff "VGS") sought a declaration that its insurer (defendant AEGIS) was obliged to defend and indemnify it in relation to certain environmental claims brought against plaintiff by the EPA. AEGIS sought discovery, including, inter alia, materials purportedly covered by the attorney-client and work product privileges tending to show "whether [the insured had] forfeited coverage under its ... insurance policies by failing to provide its insurers with timely notice." "What is at issue," the Court wrote, "is whether VGS should have notified its insurers that there was a claim or suit pending against it as a result of the March 1982 Letter" to VGS from the EPA, alerting VGS to its environmental violations. AEGIS argued, inter alia, that its policy did not cover VGS's environmental spills because the policy began in 1984, two years after VGS received the EPA's letter regarding the pollution for which coverage was being sought. The Court found that the "at issue" doctrine did not defeat VGS's attorney-client and work product privileges in the context of that case because "[a]lmost all the documents at issue post date that March 1982 letter by at least 5 years." The

---

[8]In addition, there is a contested issue as to the reasonableness of the DRP settlements, and as to the allocation of the DRP settlement amounts among the various claimants based on the nature of their claims and the elements of their damages. All of the individual settlements were apparently in lump sum amounts that covered all of the grievances and potential grievances raised by each claimant -- including punitive damages and intentional harassment accusations (matters not covered by Royal's insurance). Should defendants get past the "timely notice" threshold, as well as the additional hurdle of whether their primary coverage was properly and fully exhausted, there will remain an issue of the reasonableness of the settlements and the allocation of funds amongst covered and uncovered claims. See Charlotte Motor Speedway, Inc. v. International Insurance Co., 125 F.R.D. 127, 129-131 (M.D.N.C. 1989) (information concerning counsel's activities was necessary to determine whether insured met its obligations under the policy and whether settlement terms and defense costs were reasonable).

20

Vermont Gas Systems Court distinguished the case before it from an effective invocation of the
"at issue" doctrine, as follows:

> The 'at issue' doctrine 'stems from traditional notions of waiver. By taking an
> action that places privileged information 'at issue' the party may forfeit the
> privilege.' Remington Arms Co. v. Liberty Mutual Ins. Co., 142 F.R.D. 408, 412
> (D.Del. 1992). However, the scope of such a waiver is uncertain and vanes
> according to the nature of the information 'at issue.' AEGIS relies heavily on
> Potomac Elect. Power Co. v. California Union Ins. Co., 136 F.R.D. 1 (D.D.C.
> 1990) to support the proposition that a plaintiff seeking insurance coverage for
> underlying claims waives attorney-client privilege and work product protection as
> to documents relevant to their conduct and the conduct of their counsel. Potomac
> involved a dispute concerning the amount of settlement and litigation costs
> already incurred by an insured before it brought suit to recoup those costs against
> its insurance carriers. In Potomac, the plaintiff was sued as a result of PCB
> contamination it was allegedly responsible for. Before it brought suit against its
> insure[r]s, it reached a settlement of the PCB claims for approximately $3.25
> million in clean-up costs, allegedly incurring $3.5 million for defense costs in the
> underlying proceedings. The insurers balked at indemnifying and reimbursing the
> insured and litigation ensued. The district court held that the insured's 'conduct
> and the apportionment of costs in connection with the investigation, defense, and
> settlement of the underlying proceedings are directly at issue in this case.'
> Potomac, 136 F.R.D. at 4. *Because the insured brought its own conduct and the
> conduct of its counsel in the underlying proceedings into issue, the district court
> held that the insurers were 'entitled to inspect documents pertaining to the
> underlying proceedings, regardless of whether they contain attorney work
> product or communications normally protected by the attorney-client privilege.'*
> Id.; emphasis supplied.

While superficially the instant case resembles Vermont Gas Systems, Inc., supra, in that,

at least on this application, "timely notice" is the issue, in fact the reasoning in Potomac Elect.

Power Co., supra, is more apposite in that defendants' "own conduct and the conduct of its

counsel in the underlying proceedings [are in] issue." As noted above, defendants' counsels'

ongoing assessments of the value of the class-action plaintiffs' claims are critical to a

determination of when defendants were on notice that the aggregate value of the underlying

claims — in their attorneys' estimation — was likely to exceed their **primary** coverage.   Because —

21

at least in the context of excess insurance coverage as presented by the instant case -- defendants cannot prove the timeliness of their notice without this material, the excess insurer is "entitled to inspect documents pertaining to the underlying proceedings, regardless of whether they contain ... work product or communications normally protected by the attorney-client privilege." Id.

Metropolitan Life Ins. Co. v. Aetna Casualty and Surety, 730 A.2d 51 (Conn. 1999), relied upon by defendants, does not require a different result. In that Decision — in which the Court gives a very restrictive interpretation of the "at issue" exception to the attorney-client privilege — the Court ruled that a **party** only "waived the right to [attorney-client] confidentiality by placing the content of the attorney's advice directly at issue because the issue cannot be determined without an examination of that advice" (emphasis supplied). Where the party opposing disclosure was not itself relying "on any information or advice contained in the privileged documents," the "at issue" waiver was not triggered (emphasis supplied). Here, in contrast, as noted above, defendants must themselves rely upon their own adjusters' and counsels' "rolling" assessments of the value of the class-action claims to prove that their notice to Royal was given within a reasonable time after they realized that the total pay-out was likely to exceed their primary coverage.

Accordingly, the Court concludes that defendants' attorney-client and work-product defenses to disclosing all documents relating to "settlement" and "assessment" listed in their privilege logs are overcome by the "at issue" doctrine on the facts of this case.

2. *"Substantial Need":*

Plaintiffs also have a substantial need for the withheld "assessment" materials, since the allegedly "privileged" "work product" records relate to central issues in the case such as late notice

22

and settlement-fund-allocation, as well as the reasonableness of the settlements. Moreover, plaintiffs cannot obtain the substantial equivalent of these materials without undue hardship. <u>See</u> <u>Lamitie</u> v. Emerson Electric Co., <u>supra</u> at 1083; CPLR 3101(d)(2). Defendants' suggestion that plaintiffs can extract all relevant information at depositions is unreasonable, because defendants' witnesses are unlikely to remember in 2004 the details of settlement demands, discussions and assessments held seven to eight years ago. Accordingly it is

ORDERED that plaintiffs' motion in effect to compel defendants to produce settlement- and assessment-related documents listed on their privilege logs is granted; and it is further

ORDERED that defendants are directed to produce said documents within 30 days of service upon them of a copy of this Order with notice of entry.

The foregoing constitutes the Decision and Order of the Court.

Date: June 29, 2004
New York, New York

_____
SHIRLEY WERNER KORNREICH

23