UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AIU INSURANCE COMPANY,

                              Plaintiff,                    07 Civ. 7052 (SHS)

             -against-

TIG INSURANCE COMPANY,                         OPINION & ORDER

                              Defendant.

SIDNEY H. STEIN, U.S. District Judge.

    This action brings this Court into the field of reinsurance, where, according to the New York Court of Appeals, "differences have often been settled by handshakes and umpires, and pertinent precedents . . . are few in number." *Sumitomo Marine & Fire Ins. Co., Ltd.–U.S. Branch v. Cologne Reinsurance Co. of Am.*, 75 N.Y.2d 295, 298, 552 N.E.2d 139, 140 (1990). In the late 1970s and early 1980s, plaintiff AIU Insurance Company purchased nine certificates of facultative reinsurance ("CFRs" or "certificates")—that is, reinsurance policies that cover a specified risk— from International Insurance Company. (Defendant TIG Insurance Company is the successor-in-interest to International Insurance Company and, for ease of reference, this Court shall refer exclusively to TIG.) More than two decades later, when AIU wanted to benefit from the reinsurance it had purchased, it waited over three years before notifying TIG of its claim, which TIG denied. That delay lies at the heart of this litigation.

    Despite the fact that the CFRs involved a score of millions of dollars of risk, AIU and TIG had engaged in a "swift, seemingly almost casual process of contract formation that has given rise to [this] controversy." *Id.*, 75 N.Y.2d at 302, 552 N.E.2d at 142. Crucially, none of the CFRs contained a choice-of-law clause. This matters because of a split among the states on what constitutes "prompt notice" in the reinsurance context. Traditionally, reinsurers—here, TIG—could refuse coverage if the ceding insurer—the party that purchases the reinsurance, here AIU—violates the plain language of the notice provision by failing to provide "prompt

1

notice."  By contrast, an emerging majority of jurisdictions require the reinsurer to prove not only that it received late notice of the ceding insurer's claim, but also that the reinsurer suffered prejudice as a result of the notice being late.  Illinois, where TIG claims its home office was located when the CFRs were executed, apparently follows the traditional rule that prejudice does not have to be shown by the reinsurer before the reinsurer can deny a claim:  the reinsurer need only show that the notice it received was late.  AIU has its principal place of business in New York, which, unlike Illinois, requires that the reinsurer not only received notice from the ceding insurer late, but also that the reinsurer suffered prejudice as a result of the late notice.  Naturally, AIU argues that New York law applies to the CFRs, while TIG contends that Illinois law governs and therefore it has to show merely that it received notice of AIU's claim late in order to deny that claim.

In a Report and Recommendation filed on August 16, 2012 ("Report," Dkt. No. 128), Magistrate Judge Henry Pitman concluded that Illinois law should apply and recommended that this Court grant TIG's motion for summary judgment.  This Court has conducted a thorough *de novo* review of Judge Pitman's well reasoned Report and Recommendation.  *See* 28 U.S.C. § 636(b)(1).  For the reasons set forth below, the Court agrees with Judge Pitman's recommendations and grants summary judgment in favor of TIG.

## I.  BACKGROUND

### A.  The Foster Wheeler Insurance Policies and Certificates of Facultative Reinsurance

This drama opens on Foster Wheeler Corporation, which, in the 1970s and early 1980s, was a manufacturer of industrial boilers and other heat exchange equipment.  (TIG 56.1 ¶ 22.)  From 1978 to 1982, Foster Wheeler purchased primary general liability insurance from Liberty Mutual Insurance Company, among others.  (*Id.* ¶ 1.)  To cover any losses above the limits on these policies, Foster Wheeler also purchased three umbrella insurance policies from AIU.  (AIU 56.1 ¶ 13.)  These umbrella policies provided $20 million of total coverage for claims in excess of the limits

contained in the Liberty Mutual policies, and covered the period from October 1, 1978 to October 1, 1981.  (*Id.*)

After writing the umbrella policies to Foster Wheeler, AIU sought to lay off—cede—a portion of this risk upon others by purchasing reinsurance.  To do this, AIU or its broker, Johnson & Higgins of New York, sent reinsurance request notes to L.W. Biegler, Inc., the Chicago-based intermediary for TIG.  (Aldort Decl., Group Ex. 1.)  Notably, L.W. Biegler and TIG were each wholly owned subsidiaries of Crum & Forster Insurance Companies.  (TIG Resp. 56.1 ¶ 24; Reid Tr. at 26; Schwass Tr. at 25–26.)[1]  Once AIU's application was approved, L.W. Biegler, on behalf of TIG, issued AIU "binders," the trade name for temporary policies that applied until the final CFRs were executed.  (Larson Decl., Ex. 1.)  Some time later, TIG issued the CFRs to AIU.  (The fully executed CFRs are attached to the Declaration of Julie Rodriguez Aldort as Exhibits 11–19.)

Each of the CFRs contained essentially identical substantive terms set forth on preprinted forms. Two of the terms are especially relevant to this action.  First, each CFR required a countersignature before the certificate became binding.  (*E.g.*, Aldort Decl., Ex. 11 at 62311.)  Second, the CFRs all contained identical notice provisions, which stated:  "Prompt notice shall be given to the Reinsurer [TIG] by the Company [AIU] of any occurrence or accident which appears likely to involve this reinsurance . . . ."  (*E.g.*, *id.* ¶ B.)  The notice provision also gave TIG the opportunity to associate with AIU "in the defense and control of any claim, suit or proceeding involving [the] reinsurance . . . ."  (*E.g.*, *id.*)  Finally, none of the CFRs contained a choice-of-law clause or explicitly identified the place the CFRs were to be performed.

## B.   The Foster Wheeler Litigation

Unfortunately for Foster Wheeler, its customers, and its insurers, the products that it manufactured and AIU insured contained asbestos.  As a result, Foster Wheeler has been subject to hundreds of thousands of asbestos-related lawsuits across the country.  (TIG 56.1 ¶ 22.)  These

---

[1]   All deposition transcripts cited in this Opinion are attached as exhibits to the Declaration of Marc L. Abrams.

individual suits also gave rise to large-scale litigation among and between Foster Wheeler and its insurers.  In February 2001, several London-based insurance companies sued Foster Wheeler, Liberty Mutual, TIG, and many other insurers, seeking a declaration of the obligations of the defendants with respect to asbestos-related claims made against Foster Wheeler (the "Coverage Litigation").  (TIG Resp. 56.1 ¶ 46.)  Five months later, Foster Wheeler filed a third-party complaint against AIU and other excess insurers for declaratory relief concerning the excess insurers' responsibilities to pay Foster Wheeler's defense and indemnity costs.  (TIG 56.1 ¶ 26.)

AIU avers that the umbrella policies were well insulated from the many asbestos-related personal injury claims.  (AIU Mem. in Supp. at 7.) This confidence stemmed from the terms of the umbrella policies, which would not be triggered by any individual asbestos-related loss unless it exceeded $100,000.  (AIU 56.1 ¶ 12.)  AIU's sense of calm evaporated in 2003 when an individual plaintiff negotiated a settlement with Foster Wheeler worth over $10 million.  (Abrams Decl., Ex. 300 at 35007.1–08.1.) Then, in a letter dated October 28, 2003, attorneys representing Foster Wheeler demanded that AIG pay nearly $20 million to cover asbestos-related personal injury claims.  (Abrams Decl., Ex. 43.)  AIU eventually reached a settlement agreement with Foster Wheeler in June 2006.  (AIU Resp. 56.1 ¶ 35.)

### C.  AIU Gives Notice to TIG

Although AIU had received a demand letter from Foster Wheeler in October 2003, AIU did not notify TIG that a claim had been made against AIU until January 2007.  In a letter dated January 25, 2007, Richard Kafaf, a reinsurance claims analyst for AIU, notified TIG of AIU's June 2006 settlement with Foster Wheeler and stated that AIU would begin billing TIG the next month on its reinsurance claims.  (Abrams Decl., Ex. 545.) TIG responded a week later by raising the issue of late notice and reserving its rights under the CFRs.  (*Id.*, Ex. 547.)  The parties attempted to reach agreement concerning their obligations under the CFRs, but these talks failed.  AIU then filed this action on August 7, 2007.

### D.   Procedural Background

In its Complaint, AIU asserted two claims for relief against TIG: breach of contract and declaratory judgment concerning TIG's liability under the CFRs.  TIG answered and the parties proceeded to discovery.  In July 2009, TIG moved for partial summary judgment on the issue of whether Illinois or New York law governed the CFRs; whether a reinsurer must prove prejudice, in addition to late notice, in order to refuse coverage under Illinois law; and whether TIG provided AIU reinsurance coverage from October 1981 to October 1982.  Judge Pitman issued a Report and Recommendation agreeing with TIG on these issues.  *See AIU Ins. Co. v. TIG Ins. Co.*, No. 07 Civ. 7052, 2010 WL 850181 (S.D.N.Y. Feb. 11, 2010).  However, this Court believed that TIG's motion was premature since discovery was still proceeding and vacated Judge Pitman's Report and Recommendation in large part—but adopted the recommendation that TIG did not provide coverage from 1981 to 1982.  *See AIU Ins. Co. v. TIG Ins. Co.*, No. 07 Civ. 7052, 2010 WL 882879 (S.D.N.Y. Mar. 9, 2010).

Discovery is now complete and the parties have cross-moved—TIG for summary judgment and AIU for partial summary judgment.  AIU argues that New York law applies to the CFRs, and thus TIG must prove not only that AIU's notice was late, but that TIG suffered prejudice as a result.  TIG argues that Illinois law applies; and if it does, TIG need only prove that AIU's notice was late in order for TIG to deny coverage under the CFRs.  Judge Pitman issued a second Report and Recommendation on August 16, 2012 that recommended that this Court grant TIG's motion for summary judgment and deny AIU's.  Specifically, Judge Pitman recommended this Court hold that the CFRs are governed by Illinois law, that Illinois law does not require a showing of prejudice, and that TIG had no actual notice of AIU's claims.[2]  AIU has objected to Judge Pitman's recommendations and this matter has been fully briefed.

---

[2]     Judge Pitman also recommended that this Court grant in part and deny in part TIG's motion to strike certain portions of a declaration submitted by AIU.  (Report at 12–20.)  Neither party objected to this recommendation and, after *de novo* review, the Court adopts Judge Pitman's conclusions concerning TIG's motion to strike.

## II. Discussion

"Summary judgment may be granted only when the moving party demonstrates that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Coughlin,* 64 F.3d 77, 79 (2d Cir. 1995) (quotation marks omitted); *accord Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986). This Court may not weigh evidence or evaluate credibility when considering a summary judgment motion, *see Velez v. Sanchez,* 693 F.3d 308, 314 (2d Cir. 2012), and must "draw all reasonable inferences in favor of the non-moving party . . . ." *Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 150 (2000). "The same standard applies where the parties file cross-motions for summary judgment." *Specialty Nat. Ins. Co. v. English Bros. Funeral Home,* 606 F. Supp. 2d 466, 470 (S.D.N.Y. 2009). "[E]ach party's motion must be [] examined on its own merits, and in each case all reasonable inferences must be drawn against the [] party whose motion is under consideration." *Lyons v. Lancer Ins. Co.,* 681 F.3d 50, 57 (2d Cir. 2012) (quotation marks omitted). With these directions in mind, the Court will first consider whether Illinois or New York law applies to the CFRs, then determine the content of that law, and finally apply that law to the facts of this case.

### A. Illinois Law Applies to the CFRs

As a federal court sitting in diversity, the Court must look to the choice of law principles of the forum state—New York—to determine which state's substantive law applies in this action. *See Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496 (1941). A CFR is a contract, and thus subject to New York's choice of law rules for contracts. *See, e.g., Folksamerica Reinsurance Co. v. Republic Ins. Co.,* No. 03 Civ. 402, 2003 WL 22852737, at *4 (S.D.N.Y. Dec. 2, 2003), *vacated on other grounds,* 182 F. App'x 63 (2d Cir. 2006). Where parties to a contract do not specify which state's law should apply, New York courts fill this gap by employing an approach known as "grouping of contacts" or "center of gravity." *In re Allstate Ins. Co. (Stolarz),* 81 N.Y.2d 219, 226, 613 N.E.2d 936, 939 (1993); *see also, e.g., Milgrim v. Backroads, Inc.,* 142 F. Supp. 2d 471, 474 (S.D.N.Y. 2001), *aff'd,* 91 F. App'x 702 (2d Cir. 2002). Thus a court considers "the spectrum of significant contacts[,] rather than a single possibly fortuitous event,"

*Stolarz*, 81 N.Y.2d at 226, 613 N.E.2d at 939, in order to apply the law of "'the place having the most interest . . . over the legal issues arising out of a particular factual context . . . .'" *In re Liquidation of Midland Ins. Co.*, 16 N.Y.3d 536, 544, 947 N.E.2d 1174, 1179 (2011) (quoting *Auten v. Auten*, 308 N.Y. 155, 161, 124 N.E.2d 99, 102 (1954)).

The relevant contacts a court should consider principally include "the place of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *Stolarz*, 81 N.Y.2d at 227, 613 N.E.2d at 940; *see also* Restatement (Second) of Conflict of Laws ("Restatement") § 188(2). But not all contacts are created equal. First of all, "the traditional choice of law factors should be given heavy weight in a grouping of contacts analysis."[3] *Stolarz*, 81 N.Y.2d at 226, 613 N.E.2d at 939 (quotation marks omitted). This emphasis applies doubly in the specific context of reinsurance disputes, where "the state where the reinsurance certificate issued and the location where performance is expected, i.e. the place to which the ceding insurer must make its demand for payment, typically control for purposes of choice of law." *Folksamerica*, 2003 WL 22852737, at *5.

Judge Pitman concluded that Illinois law applied primarily because all the CFRs were executed in that state and AIU agreed to perform there. (Report at 23–43.) AIU has objected to these recommendations and urges this Court to adopt a more fluid approach to the choice-of-law analysis. However, this Court agrees with Judge Pitman that the CFRs were issued in Illinois and AIU agreed to perform there. New York's established choice of law rules—which this Court must apply—thus mandate that Illinois law applies to the CFRs.

---

[3]   When the "traditional choice of law factors" exclusively governed this type of analysis, "[a]ll matters bearing upon the execution, the interpretation and the validity of contracts . . . [were] determined by the law of the place where the contract [was] made, while all matters connected with its performance . . . [were] regulated by the law of the place where the contract, by its terms, [was] to be performed." *Auten*, 308 N.Y. at 160, 124 N.E.2d at 101 (quotation marks omitted).

### 1.   *The CFRs Were Entered Into in Illinois*

Under New York law, a "contract [is] deemed made in the State where the last act necessary to make it binding takes place according to the law of contracts." *Intercontinental Planning, Ltd. v. Daystrom, Inc.*, 24 N.Y.2d 372, 382, 248 N.E.2d 576, 581 (1969); *see also Ackerley Media Grp., Inc. v. Sharp Elecs. Corp.*, 170 F. Supp. 2d 445, 449 (S.D.N.Y. 2001); Restatement § 188 cmt. e.  Each of the CFRs contained identical language that conditioned their issuance on a countersignature, as follows:  "the Company [TIG] has caused this Reinsurance Certificate to be signed by its President and Secretary at New York, New York, but the same shall not be binding upon the Reinsurer [also TIG] unless countersigned by an authorized representative of the Reinsurer."  (*E.g.*, Aldort Decl., Ex. 11 at 62311.)  Thus, on their face, the last act necessary to make the CFRs binding was a countersignature by an authorized representative of TIG.  *See Harsco Corp., Patent Scaffolding Co. Div. v. N.Y. City Dep't of Gen. Servs.*, No. 92 Civ. 2314, 1993 WL 138829, at *1 n.1 (S.D.N.Y. Apr. 23, 1993); *Elvin Assocs. v. Franklin*, 735 F. Supp. 1177, 1182 (S.D.N.Y. 1990); *Taggert v. Sec. Ins. Co. of New Haven, Conn.*, 277 A.D. 1051, 1052, 100 N.Y.S.2d 563, 565 (2d Dep't 1950).

Judge Pitman concluded that unrebutted evidence showed that all of the CFRs were countersigned in Illinois.  (Report at 30–31.)  Specifically, six CFRs state on their face that they were countersigned in Chicago, Illinois, and the TIG employee who recalled signing three of these testified that he in fact did so in Chicago.  (*See id.* at 25–26.)  TIG presented further evidence that its routine practice was to have all CFRs countersigned in Illinois.[4]  (*See id.* at 26 n.9.)  AIU did not present any affirmative countervailing evidence.  Thus, according to traditional New York choice of law principles, all CFRs were issued in Illinois.

AIU attempts to counter this conclusion by contending that the parties waived or modified the CFRs' countersignature requirement.  As AIU contends, "[t]he undisputed evidence is that the parties did not adhere to

---

[4]      The Court can consider "[e]vidence of . . . an organization's routine practice . . . to prove that on a particular occasion the . . . organization acted in accordance with the . . . routine practice."  Fed. R. Evid. 406.

this clause because the [certificates] were bound and in effect long before distribution of the countersignature." (AIU Objs. at 20.) However, the binders—temporary policies that bound the parties—state on their face that they would "be terminated and superseded upon delivery of formal policies or certificates issued to replace it." (*E.g.*, Larson Decl., Ex. 1 at 61762.) In addition, the binders themselves had countersignature requirements, and the unrebutted evidence shows that the routine practice of TIG and L.W. Biegler was to have even binders countersigned in Chicago.[5] (*E.g.*, *id.*; Joschiko Tr. at 107; Reid Tr. at 75–76; Schwass Tr. at 68.) Therefore, even if binders had been the operative contracts, they too were "issued" in Chicago, Illinois.

### 2.  *The Expected Place of AIU's Performance Was Illinois*

The next contact to consider in our choice-of-law analysis is the place of performance of the CFRs.  As concerns AIU, their place of performance is "the place to which the ceding insurer must make its demand for payment . . . ." *Folksamerica*, 2003 WL 22852737, at *5.  The CFRs are either deafeningly silent on this issue, or at most, vague and ambiguous.  As such, the Court may look to extrinsic evidence that casts light on this issue. *See British Int'l Ins. Co. Ltd. v. Seguros La Republica, S.A.*, 342 F.3d 78, 82 (2d Cir. 2003); *Greenfield v. Philles Records, Inc.*, 98 N.Y.2d 562, 569, 780 N.E.2d 166, 170 (2002).  Fortunately, the extrinsic evidence clearly demonstrates that Illinois—the location of TIG's intermediary—was AIU's expected place of performance.  (Report at 31–36.)  As Judge Pitman explained, prior to the present litigation, AIU itself sent two claims under the CFRs to L.W. Biegler's Chicago office.  (*Id.* at 31–34.)  As noted above, L.W. Biegler was TIG's Chicago-based intermediary, and both TIG and L.W. Biegler were wholly owned subsidiaries of the same company.

---

[5]    AIU points out that three of the binders do not appear to have been countersigned at all.  However, the testimony in the record—again unrebutted—shows that the routine practice of TIG and L.W. Biegler was to not retain a countersigned copy of the binders, which instead would be delivered to the ceding insurer, here AIU, or its agent.  (Reid Tr. at 77–78.)  AIU has not produced unsigned versions of any binder.

AIU, for its part, points to a memo written by an L.W. Biegler employee in 1980 that expressed concern that the CFRs did not refer to L.W. Biegler on their face.  (Abrams Decl., Ex. 14.)  That employee feared that AIU could tender a claim to either "the New York or Morristown[, New Jersey] offices [of Crum & Forster] shown on" the CFRs.  (*Id.*)  In other words, TIG's agent expected performance to take place in Chicago, but worried that AIU might interpret the CFRs to require performance either in New York or New Jersey.  (Report at 36.)  AIU's actual performance puts these fears to bed.

AIU raises two further objections to the conclusion that its expected place of performance was Illinois.  First, AIU contends that TIG could have unilaterally amended the place of AIU's performance by changing intermediaries.  (AIU Objs. at 23.)  This is incorrect.  "[A] valid modification of a contract must satisfy all the criteria essential for a valid original contract, including offer, acceptance, and consideration. . . . [M]utual assent [is] as much a requisite element in effecting a contractual modification as it is in the initial creation of a contract."  *Schwinder v. Austin Bank of Chicago*, 809 N.E.2d 180, 189 (Ill. App. Ct. 2004); *accord Mount Vernon City Sch. Dist. v. Nova Cas. Co.*, 19 N.Y.3d 28, 35, 968 N.E.2d 439, 444 (2012).

Second, AIU points out that the certificates make no reference to an intermediary—they speak only of the parties to the certificates.  (AIU Objs. at 24.)  AIU then cites *Folksamerica*, where the court concluded that a contract with similar wording to the CFRs implied that performance was to take place where the parties were located, not at the location of their intermediaries.  *See* 2003 WL 22852737, at *5–6 & n.6.  But *Folksamerica* is ultimately inapposite.  Unlike in that case, AIU actually performed under the CFRs and did so in Illinois.  Moreover, the intermediaries and parties in *Folksamerica* were not corporate siblings, as were L.W. Biegler and TIG.  In sum, the plain language of the CFRs cannot resolve this issue, but all extrinsic evidence points to Illinois as AIU's expected place of performance.

### 3. The Remaining Contacts Do Not Mandate the Application of New York Law

Both of the most important contacts in the reinsurance context—the state where the certificates were issued and the place where the ceding insurer must make its demand for payment—weigh in favor of Illinois law. *See id.* at *5. The remaining contacts—specifically, the place of "negotiation . . . ; the location of the subject matter of the contract; and the domicile of the contracting parties"—do not displace this conclusion. *Stolarz*, 81 N.Y.2d at 227, 613 N.E.2d at 940.

The parties do not dispute that negotiations took place in both New York and Illinois. (Report at 36–37.) As to the location of the contracts' subject matter, the weight of New York authority reveals that this contact has little relevance in a reinsurance dispute. (Report at 40–41.) AIU itself articulates the reason for this rule—generally a reinsurer has little actual role to play in any dispute involving the underlying insurance policies. (AIU Objs. at 29 (citing *Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 79 N.Y.2d 576, 583, 594 N.E.2d 571, 574 (1992)).)

AIU spends considerably more time contending that TIG was actually domiciled in New York, not Illinois. (AIU Objs. at 9–13.) For New York choice of law purposes, a corporation's domicile is synonymous with its principal place of business. *See Carroll v. LeBoeuf, Lamb, Green & MacRae, L.L.P.*, 392 F. Supp. 2d 621, 629 n.47 (S.D.N.Y. 2005); *Certain Underwriters at Lloyd's, London v. Foster Wheeler Corp.*, 36 A.D.3d 17, 25, 822 N.Y.S.2d 30, 36 (1st Dep't 2006), *aff'd*, 9 N.Y.3d 928, 876 N.E.2d 500 (2007). On paper, TIG's principal place of business was Illinois, the state that also regulated the company. (Abrams Decl., Ex. 639 at 60940, Ex. 640 at 60777; Gibbs Tr. at 44.)

However, all save one of TIG's officers worked from New York or New Jersey, not Illinois. (Kafaf Decl. ¶ 5; TIG Resp. 56.1 ¶ 8.) AIU has thus demonstrated that TIG's officers directed the company from elsewhere than Illinois. *Cf. Hertz Corp. v. Friend*, 559 U.S. 77, 130 S. Ct. 1181, 1192 (2010) (The "principal place of business" of 28 U.S.C. § 1332(c)(1) "is best read as referring to the place where a corporation's officers direct, control, and coordinate the corporation's activities . . . not

11

simply an office where the corporation holds its board meetings (for example, attended by directors and officers who have traveled there for the occasion).")  But even assuming, for purposes of analysis, that TIG did maintain its principal place of business in New York, this single contact does not displace the heavy weight afforded to the place of contracting and place of performance.

In sum, the two principal contacts in the reinsurance choice-of-law analysis point decidedly to Illinois.  Of the remaining contacts, one—the place of negotiation—is evenly split between Illinois and New York, one—the location of the certificates' subject matter—is effectively irrelevant, and one—domicile—may point to New York.  New York's grouping of contacts approach thus mandates that Illinois law applies to the CFRs.  *See Foster Wheeler*, 36 A.D.3d at 26–27, 822 N.Y.S.2d at 37.

### 4.  *This Court Will Not Adopt a New Choice of Law Rule to Benefit AIU*

Beyond objecting to Judge Pitman's application of New York's grouping of contacts test, AIU broadly argues that numerous unaccounted-for contacts demonstrate that New York law applies.  AIU focuses on the fact that the certificates specifically reference "New York" several times, but never once mention Illinois or Chicago in their substantive terms.  (AIU Objs. at 8–13.)  Judge Pitman also ignored, according to AIU, AIU's own principal place of business—New York.  (*Id.* at 13–15.)  AIU argues that this contact takes on especial relevance in light of the First Department's decision in *Foster Wheeler*—the Coverage Litigation.

In *Foster Wheeler*, the First Department was presented with a massive litigation that required the court to apportion "responsibility for the defense and indemnity costs of hundreds of thousands of asbestos-related personal injury claims . . . which [had] been asserted in jurisdictions throughout the United States since the 1970s . . . ."  36 A.D.3d at 19, 822 N.Y.S.2d at 31.  As the insurance policies at issue covered risks in multiple states, the court adopted a rule that used "the state of the insured's domicile . . . as a proxy for the principal location of the insured risk."  *Id.*, 36 A.D.3d at 24, 822 N.Y.S.2d at 35.  Because the insured in *Foster Wheeler*

was domiciled in New Jersey, that state's law applied to the insurance policies, even if "New York [had] constituted the place of contracting, negotiation, and the insurer's performance."  *Id.*, 36 A.D.3d at 27, 822 N.Y.S.2d at 37.  These two contacts play second fiddle to the location of the insured risk in the direct insurance context.  *See id.*

Even if this Court transposed the rule from *Foster Wheeler* into the reinsurance context, it would not affect the outcome of the choice-of-law analysis here.  As explained above, the location of the risk simply does not have much importance in reinsurance disputes—and certainly not enough to outweigh the place of contracting and the place of performance.  More broadly, *Foster Wheeler* in fact supports the approach Judge Pitman and this Court have taken with respect to the CFRs.  As the First Department wrote, "the choice-of-law analysis is not a mindless scavenger hunt to see which state can be found to have more contacts, but rather an effort to detect and analyze what interest the competing states have in enforcing their respective rules."  *Id.* (quotation marks and alteration omitted).

AIU's emphasis on the number of references to New York in the CFRs and the like is precisely the type of "scavenger hunt" that *Foster Wheeler*, and New York courts in general, have rejected.  The New York Court of Appeals has mandated the proper approach to determine what law should apply to contracts, and numerous courts have held that reinsurance contracts should generally be governed by the state of contracting and performance.  Although the dispute between AIU and TIG involves millions of dollars stemming from products sold all over the country, this case boils down to a simple alleged breach of a limited number of written contracts, all executed and intended to be performed in Illinois.  This Court will apply that state's law to the substantive terms of the CFRs.[6]

_____

[6]    The Court notes that even if New York law applied, at the time of contracting, AIU could not have reasonably anticipated that TIG would have had to prove prejudice to avoid its obligations under the CFRs.  As late as 1991, no New York appellate court had addressed this issue in the reinsurance context, and federal courts in the Southern District of New York had split on the question.  *See Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 949 F.2d 630, 631–32 (2d Cir. 1991).  The New York Court of Appeals ultimately declined to extend the direct insurance no-prejudice rule to

13

### B. Illinois Law Does Not Require TIG to Prove Prejudice in Addition to Late Notice

Having determined that Illinois law applies to AIU's performance under the CFRs, the Court must next determine the content of Illinois law concerning notice in the reinsurance context.  Ideally, this Court would look to decisions of the Illinois Supreme Court or, if no such authority existed, lower Illinois appellate courts.  *See, e.g., Blue Cross & Blue Shield of N.J., Inc. v. Philip Morris USA Inc.*, 344 F.3d 211, 220–21 (2d Cir. 2003).  It appears, however, that none of these courts has considered the question presented in this case—in fact, only one Illinois trial court has addressed this issue, and that in an unpublished opinion.  *See Cas. Ins. Co. v. Constitution Reinsurance Co.*, No. 91 L 14732 (Ill. Cir. Ct., Cook Cty. Jan. 22, 1996), Larson Supp. Decl., Ex. 5.  Although the Illinois state courts have been silent, the U.S. Court of Appeals for the Seventh Circuit did opine on the Illinois law of late notice in the context of reinsurance claims, albeit more than 70 years ago.  *See Keehn v. Excess Ins. Co. of Am.*, 129 F.2d 503 (7th Cir. 1942).  The panel in *Keehn* concluded that, under Illinois law, a reinsurer need not prove prejudice in order to refuse coverage.  *See id.* at 504–05.  Despite its vintage, TIG urges that *Keehn*'s articulation of unsettled Illinois law is binding on this Court as a result of the Second Circuit's opinion in *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278 (2d Cir. 1981).  The Court reluctantly agrees, and will first discuss *Factors*, then turn to the presumed content of Illinois law on late notice in the reinsurance context.

### 1. The Second Circuit's Decision in Factors Compels this Court to Defer to the Seventh Circuit's Keehn Opinion, Unless Illinois Law Has Subsequently Changed

In its 1981 *Factors* decision, the Second Circuit held that when a federal court of appeals, sitting in diversity, "has essayed its own prediction of the course of state law on a question of first impression within [a] state, [which falls within the territorial jurisdiction of that court of appeals,] the federal courts of other circuits should defer to that holding, perhaps always . . . ."

---

reinsurance disputes a decade after AIU entered into the CFRs.  *See Unigard Sec. Ins. Co., Inc. v. N. River Ins. Co.*, 79 N.Y.2d 576, 578, 594 N.E.2d 571, 571 (1992).

652 F.2d at 283. The *Factors* court based its ruling on two principles. First, local federal judges possess greater familiarity than "outsiders" with the law of a state within their district or circuit. *See id.* at 281, 283 & n.7 ("As it happens, the author of [the Sixth Circuit opinion that predicted what Tennessee law was on an unsettled point] is a distinguished member of the Tennessee bar," and therefore his "sense of what may be expected of the Tennessee Supreme Court surely surpasses our [i.e., judges of the U.S. Court of Appeals for the Second Circuit] own."). Second, "the orderly development of state law and fairness to those subject to state law requirements" counsel that federal courts should recognize "the authoritativeness of decisions on the law of a particular state rendered by the court of appeals for the circuit in which the state is located." *Id.* at 282. Finally, the panel in *Factors* did concede that such deference was not owed when subsequent developments of state law undermined the local Federal circuit court's ruling, or when that circuit court overlooked relevant sources of state law. *See id.* at 283.

*Factors* binds this Court, but its authoritative force has been eroded in the past thirty years for several reasons. First, Second Circuit panels both before and after *Factors* have acknowledged that the proper inquiry for a federal court sitting in diversity is to ask what deference the courts of the forum state would give to an opinion of a federal circuit court of appeals. *See Rogers v. Grimaldi*, 875 F.2d 994, 1002 & n.10 (2d Cir. 1989); *Nolan v. Transocean Air Lines*, 276 F.2d 280, 281 (2d Cir. 1960) (Friendly, J.), *judgment set aside on other grounds*, 365 U.S. 293 (1961); *see also* 19 Wright & Miller, Fed. Prac. & Proc. § 4507, at 218–20 (2d ed. 1996) (criticizing *Factors*). New York's highest court—the New York Court of Appeals—not the U.S. Court of Appeals, should provide the binding guidance to this question, for, as the U.S. Supreme Court held nearly three-quarters of a century ago, "the proper function of the [local] federal court is to ascertain what the state law is, not what it ought to be." *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 497 (1941). The New York Court of Appeals properly considers the pronouncements of a local circuit court "relevant" to determining the content of a state's law, but the views of federal circuit courts on questions of state law are not binding on the state's highest court. *Oltarsh v. Aetna Ins. Co.*, 15 N.Y.2d 111, 116, 204 N.E.2d 622, 625 (1965).

Second, since *Factors* was decided, the Supreme Court has held that federal courts of appeals cannot defer to a district court's presumed mastery of forum law. *See Salve Regina Coll. v. Russell*, 499 U.S. 225, 239 (1991) ("To the extent that the available state law on a controlling issue is so unsettled as to admit of no reasoned divination, we can see no sense in which a district judge's prior exposure or nonexposure to the state judiciary can be said to facilitate the rule of reason."). *Erie*, in fact, forecloses the proposition that a local district judge can better predict uncertain state law than any other Article III judge. *See Salve Regina*, 499 U.S. at 238. "The very essence of the *Erie* doctrine is that the bases of state law are presumed to be communicable by the parties to a federal judge no less than to a state judge." *Id. Salve Regina*'s reasoning applies equally to federal courts of appeals, which, after all, may be a further step removed from the local law of states within their territorial jurisdiction.[7]  Thus, there is no longer a principled reason for this Court to defer to the Seventh Circuit's prediction of Illinois law, but not, for example, the Ninth Circuit's prediction of that law. *See Factors*, 652 F.2d at 286 (Mansfield, J., dissenting).

Third, the *Factors* rule encourages outcome-determinative forum shopping—one of the evils that *Erie* aimed to eliminate. *See Hanna v. Plumer*, 380 U.S. 460, 468 (1965). Had the present action arisen in the state courts of Illinois, those courts would, of course, be free to reach their own view of their own law. Even if a federal court within the Seventh Circuit were hearing this action, that Court of Appeals would be able to modify its panel's earlier opinion or certify a question to the Illinois Supreme Court. The Second Circuit can do neither. *See* Ill. Sup. Ct. R. 20(a) (only the U.S. Supreme Court and the Seventh Circuit may certify questions to the Illinois Supreme Court). Ironically, the Seventh Circuit's opinion in *Keehn* only has true outcome-determining power outside of Illinois's state and federal courts. The Seventh Circuit itself has resisted arguments that would give cases such significantly different precedential properties in

---

[7]     No panel of the Second Circuit—or any other circuit, to this Court's knowledge—has discussed the impact of *Salve Regina* on the holding of *Factors*.

16

federal and state courts.  *See Allstate Ins. Co. v. Menards, Inc.*, 285 F.3d 630, 636 (7th Cir. 2002).

The uniform development of a state's law—the second principle supporting the *Factors* holding—is indeed a worthy goal.  Any court wading into uncertain legal waters need act with prudence, hesitation, and consideration.  But the *Factors* approach—that federal courts must defer to the decisions of the "local" federal circuit on a question of unsettled state law from a state within that circuit—locks the courts of this Circuit into a bind of dubious value.  Nevertheless, this Court is bound by *Factors*' ruling and must turn to consider the 70 years of relevant state law following *Keehn* (neither party raises earlier law) to determine if *Keehn*'s prediction of Illinois law is still entitled to dispositive weight.

### 2.  *No Subsequent Developments in Illinois Law Have Displaced Keehn*

In *Keehn*, the Seventh Circuit predicted that, under Illinois law, a notice provision in a reinsurance contract was a condition precedent to recovery, notwithstanding the lack of clear language supporting that reading in the contract itself.  *See* 129 F.2d at 504–05.  As a result, a reinsurer does not need to prove that it was prejudiced by late notice before denying coverage to a ceding insurer.[8]  *See id.  Keehn* based its conclusion on two decisions of the Illinois Supreme Court, both dealing with direct insurance and both handed down in 1881:  *Scammon v. Germania Insurance Co.*, 101 Ill. 621 (1881), and *Niagara Fire Insurance Co. v. Scammon*, 100 Ill. 644 (1881).  *See Keehn*, 129 F.2d at 505.

AIU has not pointed this Court to any decision by any Illinois state or federal court disagreeing with *Keehn*'s conclusion.  The only Illinois state court to address this issue specifically in the reinsurance context stated, in dicta, "that in Illinois no prejudice need be shown."  *Constitution Reinsurance*, Slip Op. ¶ 25.  In the absence of controlling case law, AIU relies on the numerous decisions from other jurisdictions that have

---

[8]     In the alternative, the Seventh Circuit was "of the view" that under Illinois law, if the reinsurer loses its contractual right and opportunity to associate with the ceding insurer, this fact alone would constitute prejudice.  *Keehn*, 129 F.2d at 505.

required prejudice to the reinsurer in addition to late notice on the part of the ceding insurer.  (AIU Objs. at 28–29.)  Indeed, it appears that Illinois, with its no-prejudice rule, is now in the minority.  *See* 1A Couch on Ins. § 9:32 (rev. 3d ed. 2010); 14 Holmes' Appleman on Ins. § 105.7(B) (2d ed. 2000 & Supp. 2009); 2 Ostrager & Newman, Handbook on Ins. Coverage Disputes § 16.02[b] (16th ed. 2013).

Whether Illinois is in the majority, the minority, or stands alone—this simply is not relevant.  In *Country Mutual Insurance Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338 (Ill. 2006), the Illinois Supreme Court overruled several intermediate Illinois courts, which had held—in the direct insurance context—that an insurer must prove prejudice in addition to late notice to escape covering an insured loss.  *See id.* at 346.  The court entertained arguments that "public policy considerations favor a prejudice requirement," but ultimately concluded that "[b]alancing dueling policy concerns is a more appropriate role for the legislature" than for the Illinois Supreme Court.  *Id.* at 347.  The *Livorsi* court particularly noted that requiring prejudice in addition to late notice was "not especially persuasive when the policyholders . . . are two sophisticated commercial parties . . . ."  *Id.*

This Court will not enter a policy debate where the Illinois Supreme Court itself feared to tread.  Thus, the Court adopts the Report and Recommendation's conclusion that Illinois law does not require prejudice—late notice alone will defeat AIU's claim.

### C.  AIU's Notice Was Unreasonably Late Under Illinois Law

Finally the Court turns to whether AIU's notice was untimely under Illinois law.  As noted earlier, each certificate's notice provisions requires that "[p]rompt notice shall be given to the Reinsurer [TIG] by the Company [AIU] of any occurrence or accident which appears likely to involve this reinsurance . . . ."  The parties agree that this notice provision was triggered, at the latest, by AIU's receipt of Foster Wheeler's demand letter, dated October 28, 2003.  (AIU Mem. in Opp'n at 27–28.)  The question then is whether AIU's notice to TIG 3¼ years later, on January 25, 2007, was "prompt."

18

Illinois law deems a party's obligations under a "prompt" notice provision satisfied if the party gives notice within a "reasonable" amount of time. *See W. Am. Ins. Co. v. Yorkville Nat'l Bank*, 939 N.E.2d 288, 293–94 (Ill. 2010). The Illinois Supreme Court has set out five factors to consider when determining if notice, at least in the direct insurance context, was given within a reasonable period of time, as follows:

> (1) the specific language of the policy's notice provision; (2) the insured's sophistication in commerce and insurance matters; (3) the insured's awareness of an event that may trigger insurance coverage; (4) the insured's diligence in ascertaining whether policy coverage is available; and (5) prejudice to the insurer.

*Id.* (citing *Livorsi*, 856 N.E.2d at 343–44). Although this reasonableness analysis is fact-specific, "where the facts are undisputed, the reasonableness of notice to an insurer by its insured is a question of law." *Cent. Mut. Ins. Co. v. Useong Int'l, Ltd.*, 394 F. Supp. 2d 1043, 1052 (N.D. Ill. 2005) (quotation marks omitted).

The first four factors do not spark controversy. The first is effectively irrelevant, given the fact that Foster Wheeler's October 2003 letter indisputably triggered AIU's obligation to notify TIG. *See Yorkville*, 939 N.E.2d at 294. Second, both AIU and TIG are admittedly sophisticated actors in commerce and the reinsurance market. Third, there is no doubt that AIU was aware of Foster Wheeler's October 2003 demand letter, the "event that [] trigger[ed] insurance coverage." Fourth, AIU knew that coverage was available under the CFRs when it received the demand letter—after all, AIU had already made claims under those same CFRs.

The fifth factor—prejudice to TIG—attracted substantial debate from the parties. Prejudice itself is a multivariate factor, and encompasses not just whatever harm TIG suffered, but also asks whether TIG had actual notice of AIU's claims before it received formal notice. *See Yorkville*, 939 N.E.2d at 296; AIU Mem. in Opp'n at 20–24. The parties contest both of these elements.

As to TIG's alleged harm, TIG claims it was prejudiced by AIU's late notice by more than $27 million. (TIG Mem. in Opp'n at 21–35.) According to TIG, during the period when it should have been notified of

19

AIU's claims, it "commuted approximately 70% of its own reinsurance coverage for the" CFRs. (*Id.* at 21.) AIU responds that TIG voluntarily gave up this coverage and, in any event, TIG's purported losses are too speculative to be recognized by law. (AIU Reply Mem. at 15–19.) Concerning TIG's actual notice of AIU's claims prior to receiving formal notice, AIU contends that TIG itself provided direct insurance to Foster Wheeler, TIG was actively involved in the Coverage Litigation, and TIG's claims handler discussed the CFRs with TIG's reinsurance department in 2000. (AIU Objs. at 33.) Judge Pitman considered this evidence and concluded that TIG did not have actual notice of AIU's claims before it received formal notice, a conclusion that AIU disputes. (Report at 49–55.)

It is not necessary for this Court to examine these issues at length: the Court assumes, without deciding, that TIG suffered no prejudice from AIU's notice. But that notice was still unreasonable, and "once it is determined that the insurer did not receive reasonable notice of an occurrence or a lawsuit, the policyholder may not recover under the policy, regardless of whether the lack of reasonable notice prejudiced the insurer." *Livorsi*, 856 N.E.2d at 346. AIU has not proffered a single case applying Illinois law where notice given more than three years late was excused. The Court's own survey of Illinois case law confirms that three years lies well outside the bounds of reasonable notice. *See Am. Nat'l Fire Ins. Co. v. Abrams*, No. 99 C 5807, 2002 WL 243455, at *5 n.17 (N.D. Ill. Feb. 19, 2002) (notice three years late not reasonable); *Transamerica Ins. Co. v. Interstate Pollution Control, Inc.*, No. 92 C 20247, 1995 WL 360460, at *17 (N.D. Ill. June 16, 1995); *Am. Nat'l Fire Ins. Co. v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 796 N.E.2d 1133, 1142 (Ill. App. Ct. 2003) (three year delay); *Gen. Cas. Co. of Ill. v. Juhl*, 669 N.E.2d 1211, 1214 (Ill App. Ct. 1996) (7½-month delay was unreasonable).

Even *Yorkville*, where notice that was 27-months late was deemed reasonable, does not aid AIU. First, AIU's delay was a full year longer than that in *Yorkville*; in addition, the insured in that case was diligent in investigating if their policy would cover a defamation lawsuit, the risk at issue. *See Yorkville*, 939 N.E.2d at 294–95. In fact, an agent from the insurance company told the insured that the policy did not cover such a risk. *See id.* at 295. Once the insured discovered that this advice was

incorrect, it promptly gave notice to its insurer. *See id.* By contrast, AIU always knew that the Foster Wheeler risks were covered by the CFRs—it simply failed to give timely notice.

Simply put, AIU, a sophisticated insurance company, waited more than three years before giving notice to TIG, despite the fact that AIU was aware of the fact that triggered the CFRs' notice provision, and despite the fact that AIU was aware that coverage under the CFRs was available. Even if TIG did not suffer prejudice as a result of this three-year delay, AIU did not give notice within a reasonable amount of time. Thus, under Illinois law, TIG may refuse coverage under the CFRs.

## III. CONCLUSION

Choice-of-law and *Erie* analyses often require courts to engage in what amounts to judicial augury. However difficult this process might be, it is nonetheless bound by specific rules established, in this case, by the New York Court of Appeals and the U.S. Court of Appeals for the Second Circuit. The application of those rules to the undisputed facts in this matter leads to the conclusions that both Judge Pitman and this Court have reached. The Court adopts Judge Pitman's Report and Recommendation in full. TIG's motion for summary judgment is granted and AIU's cross-motion for partial summary judgment is denied.

Dated:  New York, New York
       March 25, 2013

SO ORDERED:

Sidney H. Stein, U.S.D.J.

21